### A09A0286. TRIAD HEALTH MANAGEMENT OF GEORGIA, III, LLC v. JOHNSON.
(679 SE2d 785)

ADAMS, Judge.

Anthony M. Johnson, individually, as administrator of Matthew Johnson's estate, and as Matthew Johnson's next of kin, sued Triad Health Management of Georgia, III, LLC d/b/a Tara at Thunderbolt Nursing and Rehabilitation Center ("Triad") in the State Court of Chatham County. According to the complaint, as a proximate result of Triad's negligence, Johnson's father, Matthew Johnson, developed bed sores, which led to his development of sepsis and his subsequent hospitalization, illness, and death. Triad answered and filed a

---

contemporaneous motion to compel arbitration and stay proceedings. Following our grant of its application for interlocutory appeal, Triad appeals from the trial court's order denying its motion to compel arbitration of the disputes at issue in the complaint. For reasons that follow, we reverse.

"We review the record in this case de novo to determine whether the trial court's denial of the motion to compel arbitration is correct as a matter of law." *Ashburn Health Care Center v. Poole*, 286 Ga. App. 24 (648 SE2d 430) (2007). See *Harris v. SAL Financial Svcs.*, 270 Ga. App. 230, 231 (606 SE2d 293) (2004). So viewed, the record shows that on September 27, 2005, Matthew Johnson was admitted to a Triad-operated nursing home in Chatham County. Pursuant to the admission, Johnson signed an "Admission Contract" among Triad, Matthew Johnson as "Patient/Resident," and Johnson as "Fiduciary Party." Matthew Johnson, who was incapacitated at the time, did not sign the Admission Contract. The agreement provides that any dispute, whether in contract or in tort, arising out of the provision of health care services by Triad be resolved by binding arbitration pursuant to the Federal Arbitration Act, 9 USC §§ 1-16 (the "FAA").

1. As a threshold issue, we conclude that the FAA governs the agreement to arbitrate. The FAA applies to "a contract evidencing a transaction involving commerce." 9 USC § 2. For purposes of 9 USC § 2, "the word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U. S. 265, 277 (III) (115 SC 834, 130 LE2d 753) (1995). Whether or not the transaction at issue had a specific effect on interstate commerce, Congress' commerce power "may be exercised . . . if in the aggregate the economic activity in question would represent a general practice subject to federal control. Only that general practice need bear on interstate commerce in a substantial way." (Citations and punctuation omitted.) *The Citizens Bank v. Alafabco, Inc.*, 539 U. S. 52, 56-57 (II) (123 SC 2037, 156 LE2d 46) (2003).

The nursing home facility at issue here was located in Savannah, Georgia, and Triad had an additional office in Maryland. The Georgia facility purchased supplies from out-of-state vendors, including medical supplies from Wisconsin and Illinois. The facility treated out-of-state patients and had patients insured through medicaid and medicare and private insurance providers, and some of the private insurance claims were handled in locations outside the state. Given the evidence establishing a nexus between Triad's nursing home operations and interstate commerce, and in light of the United States Supreme Court's expansive interpretation of commerce for purposes of the FAA, we conclude that the Admission

Contract was a contract evidencing a transaction involving commerce, and the FAA therefore applies. See *Rainbow Health Care Center v. Crutcher*, 2008 U. S. Dist. LEXIS 6705, *7-16 (N.D. Okla. 2008) (arbitration agreement in nursing home admission contract was governed by FAA; the provision of nursing home care amounted to interstate commerce); *Washburn v. Beverly Enterprises-Georgia, Inc.*, 2006 U. S. Dist. LEXIS 73267, *6 (II) (A) (S.D. Ga. 2006) (FAA applied since "nursing home care substantially affects interstate commerce in the aggregate and is also subject to federal control"); *Briarcliff Nursing Home v. Turcotte*, 894 S2d 661, 667-678 (V) (Ala. 2004) (transaction evidenced by nursing home admission contract affected interstate commerce). Furthermore, the Admission Contract provided that the agreement to arbitrate was pursuant to the FAA. "[I]f the intent of the parties indicates that arbitration would be governed by the FAA, this Court will enforce the intentions of the parties." (Citation omitted.) *Results Oriented v. Crawford*, 245 Ga. App. 432, 437 (1) (a) (538 SE2d 73) (2000).

2. Under the FAA, written agreements to arbitrate "a controversy thereafter arising out of such contract or transaction" are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 2. Whether there is a valid agreement to arbitrate is generally governed by state law principles of contract formation, and is appropriate for determination by the court. See *Green Tree Financial Corp. v. Bazzle*, 539 U. S. 444, 452 (123 SC 2402, 156 LE2d 414) (2003); *Galindo v. Lanier Worldwide*, 241 Ga. App. 78, 83 (526 SE2d 141) (1999). "As the party seeking arbitration, [Triad] bears the burden of proving the existence of a valid and enforceable agreement to arbitrate." *Ashburn Health Care*, 286 Ga. App. at 25.

The trial court found Triad failed to carry its burden of proving the existence of a valid and enforceable agreement to arbitrate because the evidence did not establish that Matthew Johnson acknowledged or consented to waive his right to trial.[1] Triad contends that the trial court erred in so finding because Johnson bound his father by signing the Admission Contract as the fiduciary and pursuant to a valid power of attorney. We agree.

"Traditional principles of agency law may bind a nonsignatory to an arbitration agreement." *Thomson-CSF, S.A. v. American Arbitration Assn.*, 64 F3d 773, 777 (I) (C) (2nd Cir. 1995). The Admission Contract shows the parties intended that Johnson be

---

[1] This was the sole basis for the trial court's ruling, and the only holding contested on appeal. Neither party attempts to differentiate between the claims Johnson asserted in his individual capacity and those he asserted as administrator of Matthew Johnson's estate, and thus we expressly do not address that issue.

bound thereby as the fiduciary, but that he was also acting in a representative capacity for Matthew Johnson. Matthew Johnson and Johnson are both named as parties. See *Harp v. First Nat. Bank of Reynolds*, 173 Ga. 768 (161 SE 355) (1931) ("if made by an agent or attorney, [a contract] must be in the name of the principal, in order that he may be a party, because otherwise he is not bound by it"). The contract contemplates execution by the patient, Matthew Johnson, "and/or" the fiduciary, Johnson. Below the signature of the fiduciary, the agreement provides "Fiduciary Party executes this Contract in the capacit(y)(ies) checked below and shall provide evidence of Fiduciary Party's capacit(y)(ies) at the time of signing of this Contract." Below this statement are 11 boxes corresponding to various capacities in which the fiduciary might be representing the patient, such as guardian, attorney-in-fact, and trustee, among others. The agreement also provides that "Fiduciary Party shall act on behalf of Patient/Resident for all purposes permitted under applicable law."

Although the Admission Contract contemplates that Matthew Johnson be bound by its provisions and that Johnson was acting in a representative capacity, whether Johnson had the authority to bind his father is a separate issue. The only box checked under Johnson's signature is "immediate family member," and such relationship is not in itself sufficient to establish that Johnson was his father's agent. See *Ashburn Health Care*, 286 Ga. App. at 25-26 (although decedent's husband signed an agreement providing that claims related to the decedent's care at the nursing home would be arbitrated, the nursing home was unable to show that the husband was the decedent's agent and could not enforce the arbitration agreement). "The relation[ship] of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1.

The undisputed evidence shows that in effect at the time of Johnson's execution of the Admission Contract was a general power of attorney, executed by Matthew Johnson, designating Johnson as his attorney "with full power and authority to do and perform all and every act . . . necessary, requisite or proper to be done, as fully . . . as I might or could do if personally present," and without specific limitation. Thus Johnson was an immediate family member who was also Matthew Johnson's expressly appointed agent. Under the circumstances of the transaction, which involved Matthew Johnson's admission into a treatment facility while incapacitated, Johnson's execution of the Admission Contract on behalf of his father was "necessary, requisite or proper," within the scope of the agency contemplated by the power of attorney, and Matthew Johnson was

bound thereby. See OCGA § 10-6-51 ("[t]he principal shall be bound by all the acts of his agent within the scope of his authority"); *Dedousis v. First Nat. Bank of Cobb County*, 181 Ga. App. 425, 426 (2) (352 SE2d 577) (1986) (general terms of power of attorney, while strictly construed, "include those things which are usual and necessary to carry out [its] purpose") (citation and punctuation omitted). Since Johnson was his father's agent by express appointment, we need not consider whether his apparent authority was otherwise insufficient, as Johnson maintains. Rather, the trial court erred in concluding that Matthew Johnson had not agreed to arbitration under the Admission Contract.

3. Johnson further contends that the agreement to arbitrate is unenforceable in light of OCGA § 9-9-62, and that we should therefore affirm the trial court's order under the principle of "right for any reason." We disagree.

OCGA § 9-9-62 provides, among other things, that "no agreement to arbitrate shall be enforceable unless the agreement was made subsequent to the alleged malpractice and after a dispute or controversy has occurred and unless the claimant is represented by an attorney at law at the time the agreement is entered into." Since Johnson is pursuing a medical malpractice claim, see OCGA § 9-9-60 (2) (defining medical malpractice to include claims for death or injury arising out of "[c]are or service rendered by any . . . nursing home"), and the agreement to arbitrate at issue here was not entered into subsequent to the alleged medical malpractice, application of OCGA § 9-9-62 would appear to preclude its enforcement. However, OCGA § 9-9-62 does not apply because it is preempted by the FAA.[2]

> [T]he FAA preempts any state law that conflicts with its provisions or undermines the enforcement of private arbitration agreements. To the extent that state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, it will be preempted by the FAA.

(Citations and punctuation omitted.) *Langfitt v. Jackson*, 284 Ga.

---

[2] Relevant to this issue, Johnson also argued below that the FAA did not preempt OCGA § 9-9-62 in light of the McCarran-Ferguson Act, 15 USC § 1011 et seq. (the "MFA"). See *Continental Ins. Co. v. Equity Residential Properties Trust*, 255 Ga. App. 445 (565 SE2d 603) (2002). He did not, however, demonstrate that OCGA § 9-9-62 was enacted for the purpose of regulating the business of insurance within the meaning of the MFA, and has apparently abandoned the issue for purposes of appeal. Compare *In re Kepka*, 178 SW3d 279, 287-292 (Tex. App. 2005), overruled in part, *In re Labatt Food Svc.*, 2009 Tex. LEXIS 28 (February 13, 2009).

App. 628, 634-635 (3) (644 SE2d 460) (2007). Although generally applicable contract defenses, such as fraud, duress, or unconscionability, may invalidate arbitration agreements to which the FAA applies, "[b]y enacting [9 USC] § 2, . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." (Citation and punctuation omitted.) *Doctor's Assoc. v. Casarotto*, 517 U. S. 681, 687 (II) (116 SC 1652, 134 LE2d 902) (1996).

OCGA § 9-9-62 singles out a specific class of arbitration agreement and restricts the enforcement thereof counter to the "liberal federal policy favoring arbitration agreements." (Citation, punctuation and footnote omitted.) *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U. S. 20, 25 (II) (111 SC 1647, 114 LE2d 26) (1991). Further, a defense based on OCGA § 9-9-62 is not a generally applicable contract defense. It follows that OCGA § 9-9-62 is preempted by the FAA. *Haluska v. RAF Financial Corp.*, 875 FSupp. 825, 829 (N.D. Ga. 1994) (Georgia law allowing employees to bring a civil action for minimum wages earned is preempted by FAA); *Washburn*, 2006 U. S. Dist. LEXIS 73267 at *6 (Georgia's prohibition against prospective medical malpractice arbitration agreements is preempted by the FAA); *Langfitt*, 284 Ga. App. at 634-635 (3) (statute requiring that an arbitration clause in a residential real estate purchase or financing contract must be initialed by the parties to the agreement is preempted by the FAA).

4. Johnson's argument that OCGA § 9-9-62 evidences the legislature's intent that enforcement of the arbitration agreement fall within the superior court's equity jurisdiction, and that Triad therefore could not enforce the arbitration agreement through its motion in the state court, is also without merit. The approval by the superior courts contemplated by OCGA § 9-9-62 is not a requirement applicable to contracts generally or even arbitration agreements generally, nor has the legislature deemed that motions to compel arbitration be treated as equitable in nature.[3]

In sum, since Johnson, in his representative capacity, entered into an agreement to arbitrate binding on his principal, Matthew Johnson, and the agreement to arbitrate was governed by and enforceable under the FAA, notwithstanding OCGA § 9-9-62, the

---

[3] As to arbitration agreements in general, an application for an order compelling arbitration under the Georgia Arbitration Act, OCGA § 9-9-1 et seq, "shall be made to the superior court of the county where venue lies, *unless* the application is made in a pending court action, in which case it shall be made to the court hearing that action." (Emphasis supplied.) OCGA § 9-9-4 (a) (1). See *Tillman Group v. Keith*, 201 Ga. App. 680, 681 (1) (411 SE2d 794) (1991) (magistrate court had jurisdiction to hear a motion to compel arbitration).

trial court erred in denying Triad's motion to compel.
*Judgment reversed. Blackburn, P. J., and Doyle, J., concur.*

DECIDED JUNE 3, 2009 ▮▮▮▮▮▮▮▮

*Bouhan, Williams & Levy, Todd M. Baiad*, for appellant.
*Gwendolyn F. Waring*, for appellee.