**THIRD DIVISION**
**MILLER, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 28, 2016**

# In the Court of Appeals of Georgia

A16A0803.  KINDRED  NURSING  CENTERS  LIMITED
   PARTNERSHIP et al. v. CHRZANOWSKI et al.

MILLER, Presiding Judge.

This wrongful death case raises the question of whether the trial court properly determined that Jeanne Chrzanowski ("Jeanne") lacked capacity to enter into an agreement to arbitrate with Kindred Nursing Centers.[1] The trial court concluded that Jeanne lacked the necessary capacity at the time she entered into the agreement and denied Kindred Nursing Centers' motion to dismiss or to stay and to compel arbitration of the wrongful death and negligence claims filed by Jeanne's estate. After a thorough review of the record, we conclude that the trial court applied an incorrect

---

[1] The complaint named as defendants Kindred Nursing Centers Limited Partnership, Kindred Healthcare, Inc., Kindred Healthcare Operating Inc., Administrator Janet Ledlow, and Director of Nursing Timeka Hammond. We refer collectively to the defendants as "Kindred Nursing Centers."

standard and improperly shifted the burden of proof. Accordingly, we vacate the trial court's order and remand for further proceedings.

"We review the record in this case de novo to determine whether the trial court's denial of the motion to compel arbitration is correct as a matter of law." (Citation omitted.) *Ashburn Health Care Center, Inc. v. Poole*, 286 Ga. App. 24 (648 SE2d 430) (2007).

So viewed, the evidence shows that in November 2011, Jeanne was living alone when she fell at home and broke her ankle. On December 4, 2011, following surgery, Jeanne was admitted to Kindred Nursing Centers in Marietta for rehabilitation.

According to Jeanne's medical records from the hospital and Kindred Nursing Centers, she suffered from COPD, coronary artery disease, hypertension, and a history of some cognitive impairment. In the month before her fall, Jeanne went to the emergency room twice within a few days, and reported feeling "loopy" and out of sorts, with some memory loss. The second time she went, she had no recollection of her prior visit just 48 hours earlier. A neurological consult identified an altered mental state, with mild cognitive impairment, depression, and some amnesia.

Nevertheless, at the hospital after her fall in November, Jeanne was alert and oriented, and she was able to understand and consent to her treatment plan.

At the time of her admission to Kindred Nursing Centers, Jeanne required oxygen, narcotic pain medications, and antibiotics to treat a urinary tract infection. Although her son and daughter-in-law accompanied Jeanne upon her arrival to Kindred Nursing Centers, the admissions team did not complete the paperwork with Jeanne until a few days later, on December 7. The paperwork included an alternative dispute resolution agreement ("the ADR Agreement"), providing that,

> [a]ny and all claims or controversies arising out of or in any way related to this Agreement, including interpretation of this Agreement, or the Resident's stay at, or the care or services provided by, the Facility, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory, or punitive damages, and whether sounding in breach of contract, tort, or breach of statutory or regulatory duties (including, without limitation, any claim based on violation of rights pursuant to O.C.G.A. § 31-8-126, negligence, medical malpractice, any other departure from accepted standards of health care or safety, or a claim for unpaid nursing home charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to ADR as described in this Agreement.

The ADR Agreement indicated that signing it was "voluntary" and "optional." The assistant admissions coordinator Sandra Stodghill met with Jeanne to discuss the paperwork, and Jeanne signed the ADR Agreement.

Following her admission to Kindred Nursing Centers, various assessments concluded that Jeanne experienced periods of confusion and forgetfulness. Specifically, on December 5, two days before Jeanne signed the ADR Agreement, occupational therapy evaluated Jeanne and reported that she was confused, even though she was able to participate in establishing her plan of care. In weekly progress notes from December 5 through December 12, occupational therapy reported that Jeanne was very anxious and confused, commenting to staff, "look at the walls, they are coming out."

In addition, a speech pathologist evaluated Jeanne on December 7 and found that she was severely impaired in understanding yes and no questions; moderately impaired in concentration, understanding sentences, and conversation; and moderately to severely impaired in memory, reasoning, and judgment. That same day, a dietician performed a nutrition therapy assessment and found Jeanne was very confused and could not remember if she had eaten breakfast. Another assessment

4

determined that Jeanne was at risk for falls due to weakness, medications, confusion, and forgetfulness.

The history and physical completed on December 8 noted that nursing staff reported that Jeanne was more confused than usual. The following day, however, progress notes indicated that even though Jeanne experienced "poor cognition from time to time," Jeanne was alert and oriented to person and time, could understand others, had no visual or hearing deficits, and wanted to return to independent living after rehabilitation.

In the weeks following her admission, Jeanne's condition declined, resulting in additional falls and hospitalizations. Jeanne died on April 25, 2012.

Thereafter, Jeanne's sons Michael Chrzanowski, on behalf of himself and as administrator of Jeanne's estate, and Alan Chrzanowski (collectively "the Chrzanowskis") filed this wrongful death and negligence suit against Kindred Nursing Centers. Kindred Nursing Centers moved to dismiss the suit and compel arbitration, arguing that the claims were subject to arbitration under the ADR Agreement. The Chrzanowskis opposed the motion, arguing that Jeanne lacked the capacity to enter into the ADR Agreement.

In ruling on Kindred Nursing Centers' motion to compel arbitration, the trial court had the deposition testimony of Jeanne's son and daughter-in-law, Michael and Deborah Chrzanowski; the deposition testimony of the Chrzanowskis' expert, Dr. Daniel Lively; the hearing testimony of assistant admissions coordinator Sandra Stodghill; and the hearing testimony of Kindred Nursing Centers' expert, Dr. Gary Grove.

In her deposition, Deborah Chrzanowski testified that Jeanne lived alone prior to her fall, was somewhat independent, and continued to drive. The family noticed that Jeanne needed more assistance with some things as early as 2010, and they began to see changes in Jeanne's mental capacity. When Jeanne was in the hospital after her ankle surgery, she seemed confused about the time of day, and sometimes forgot whether she had eaten. Deborah admitted, however, that at the time of her admission to the nursing home, Jeanne knew where she was, knew that she had broken her ankle, and knew that she would need to stay in the nursing home for some time. In fact, Jeanne was "mad" and wanted to leave. Deborah testified that, in the few weeks after her admission, Jeanne became more confused and forgetful.

Michael Chrzanowski testified that his mother suffered from dementia and Alzheimer's disease and was deteriorating mentally since 2010. Michael offered

contradictory testimony about whether Jeanne was able to drive. He further testified that before her fall in November, Jeanne was often forgetful, would leave the oven on, forget to pay bills, and no longer did household chores. He explained that Jeanne was "out of it" while in the hospital after her surgery, and she yelled that people were out to get her and that she was going to call the police. In contradiction to Deborah's testimony, Michael testified that when Jeanne was admitted to Kindred Nursing Centers, she did not know where she was or what was happening. He believed her mental status declined while she was in Kindred Nursing Centers.

Dr. Lively, who was certified in internal medicine and geriatrics, testified on behalf of the Chrzanowskis. Dr. Lively stated that based on the medical records from the hospital and Kindred Nursing Centers, in his opinion, Jeanne lacked the capacity to sign the ADR Agreement. He also reviewed Michael Chrzanowski's deposition, which corroborated his conclusion that Jeanne suffered from dementia.

According to Lively, the evaluations done in October, coupled with the records from Kindred Nursing Centers, verified that Jeanne was experiencing chronic dementia. Lively further opined that there was no evidence of "waxing and waning" mental status or periods of lucidity. Rather, Jeanne's records showed that she had a series of medical problems that were likely to produce dementia, including COPD,

coronary artery disease, depression, and oxygen dependency. Moreover, Dr. Lively opined that Jeanne suffered from progressive dementia and medication-induced delirium resulting from her pain medications and the use of anesthesia during surgery. He further opined that Jeanne's dehydration and urinary tract infection altered her mental status. Lively explained that drops in oxygen levels from COPD or the improper use of oxygen could result in confusion and memory loss. Thus, Lively testified that after reviewing the records, it was his opinion, to a reasonable degree of medical certainty, that Jeanne suffered from significant cognitive impairment and lacked the capacity to understand the ADR Agreement at the time she signed it.

In support of their motion to compel arbitration, Kindred Nursing Centers offered the testimony of assistant administrator Stodghill, who had completed the paperwork and ADR Agreement with Jeanne two days after Jeanne was admitted. Stodghill remembered that Jeanne seemed to be intelligent, alert, and oriented. She testified that Jeanne was adamant about looking over all the paperwork and signing it, and Jeanne did not ask any questions. Stodghill further stated that she would not have completed the paperwork with Jeanne if she thought Jeanne was confused. Although Stodghill admitted that she did not review any of the notes or evaluations in Jeanne's chart before having Jeanne sign the paperwork, she testified that she had

worked in nursing homes for many years and was formerly a certified nursing assistant. She testified that, when she usually completed paperwork with residents and families, she told them the ADR Agreement was optional, and if they had questions, she would have them talk to the admissions director.

Kindred Nursing Centers also offered the testimony of its expert, Dr. Grove, a psychiatrist with a specialization in geriatric psychiatry. Dr. Grove testified that he did not examine or treat Jeanne, but had reviewed her records to form an opinion as to her capacity to understand the ADR Agreement. Grove explained that confusion did not equate to lack of capacity, and patients suffering from confusion could have periods of lucidity. He found no evidence of any dementia diagnosis until February 2012, well after Jeanne's admission to Kindred Nursing Centers. Grove disagreed with Lively's assessment and found that Jeanne's impairment was more consistent with acute and sudden delirium that would resolve itself. Grove explained that confusion resulting from low oxygen levels also would resolve itself once the oxygen levels increased. Grove noted that the records showed Jeanne had lived independently and was able to perform her own activities of daily living prior to her hospitalization, which would be inconsistent with a finding of severe cognitive impairment. Grove further explained that the nursing progress notes from December 7 identified only

9

intermittent periods of confusion, and the notes from December 8 showed no confusion at all. Grove discounted the evaluations from the speech pathologist and the dietician because neither one was qualified to determine Jeanne's capacity. Accordingly, Grove opined that Jeanne had the necessary capacity to enter into the ADR Agreement at the time she signed it on December 7.

After considering all of the evidence, the trial court denied the motion to compel arbitration, applying the standard applicable to motions for summary judgment, and explaining that Kindred Nursing Centers bore the burden of proving an absence of evidence supporting the Chrzanowskis' claim that Jeanne lacked capacity to enter the contract. Based on the evidence presented, and applying this standard, the trial court found that Kindred Nursing Centers had not met its burden because there was sufficient evidence that Jeanne lacked the capacity to enter into the ADR Agreement at the time she signed it. This Court granted Kindred Nursing Centers' application for interlocutory appeal, and this appeal followed.

1. In its first enumeration of error, Kindred Nursing Centers argues that the trial court erred in applying the summary judgment standard and placing the burden of proof on it to disprove the Chrzanowskis' defense of incapacity. We agree.

Georgia law provides that a party may seek an order compelling arbitration, and upon a challenge to the validity of the agreement, the trial court "shall summarily hear and determine that issue and, accordingly, grant or deny the application for an order to arbitrate." OCGA § 9-9-6 (a); see also *Triad Health Mgmt. of Ga., III, LLC v. Johnson*, 298 Ga. App. 204, 206 (2) (679 SE2d 785) (2009) ("whether there is a valid agreement to arbitrate is . . . appropriate for determination by the court.").

"Whether there is a valid agreement to arbitrate is generally governed by state law principles of contract formation, and is appropriate for determination by the court." *Triad Health Mgmt. of Ga., III, LLC*, supra, 298 Ga. App. at 206 (2). As the party seeking arbitration, Kindred Nursing Centers bears the burden of proving the existence of a valid and enforceable agreement to arbitrate. *Ashburn Health Care Center, Inc.*, supra, 286 Ga. App. at 25. Nevertheless, as the party challenging Jeanne's capacity to enter into a contract, the Chrzanowskis bear the burden of showing Jeanne's incapacity. *Nelson v. State Farm Life Ins. Co.*, 178 Ga. App. 670, 672 (1) (344 SE2d 492) (1986). A contract entered into by one who is mentally incompetent is voidable rather than void. OCGA § 13-3-24 (a).

Here, Kindred Nursing Centers produced the ADR Agreement, which Jeanne signed. Accordingly, they established a prima facie case with regard to whether

11

Jeanne entered into an enforceable contract. See OCGA § 13-3-1. The burden of proof then shifted to the Chrzanowskis, as the party challenging that agreement, to show that Jeanne lacked the capacity to enter into the agreement. *Nelson*, supra, 178 Ga. App. at 672 (1).

> One of the tenets of our contract law is that a party must be able to contract. However, every person is presumed to be of sound mind and discretion but the presumption may be rebutted. For this reason our courts start with the general rule that every [person] is presumed to have all [her] mental faculties and to be of normal and ordinary intelligence, and where it is contended that one who executed a contract was not competent to execute it, the burden is upon [she] who asserts the incompetency. Mental or physical impairment is never presumed. It must be proved.

(Citations and punctuation omitted.) Id.

Moreover, as we have explained,

> In order to void a contract on the ground of mental incapacity of the maker, [she] must have been non compos mentis, that is, entirely without understanding, at the time the contract was executed. It is also the policy of Georgia law, wherever possible, to uphold contracts and to uphold the capacity of one to enter into a contract. Further, even proof of a temporary loss of sanity or competency would create no presumption that it continued up to the time of execution of the contract,

12

and the burden remains on the party alleging incapacity to show such incapacity at the very time of the transaction.

(Citations and punctuation omitted.) Id.

In its ruling, the trial court relied on *Anderson v. Benton*, 295 Ga. App. 851 (673 SE2d 338) (2009), for the proposition that the summary judgment standard applied to its resolution of a motion to compel arbitration. We find *Anderson*, supra, 295 Ga. App. 851, inapposite. In that case, the trial court applied the summary judgment standard because the parties had, in fact, moved for summary judgment on their motion to enforce a settlement agreement. Id. at 852.

Moreover, in applying the summary judgment standard, the trial court in this case improperly shifted the burden of proof and required Kindred Nursing Centers to demonstrate an absence of any evidence that Jeanne lacked capacity. By shifting the burden of proof, the trial court misapplied our case law presuming competency, which places the burden on the person claiming incapacity, and ignored the well-settled preference for upholding contracts. We note that if the summary judgment standard applied, the trial court would not have been able to resolve the conflicting evidence of Jeanne's capacity, as it did here.

13

We find that the use of the summary judgment standard to evaluate a person's capacity to enter an arbitration agreement is improper. Notably, sending factual questions to a jury to determine capacity to enter into an arbitration contract would effectively turn every challenge to an arbitration agreement into a mini-trial. This would defeat the entire purpose of arbitration, and ignore this Court's intention to uphold arbitration agreements when possible. *Helms v. Franklin Builders, Inc.*, 305 Ga. App. 863, 865 (700 SE2d 609) (2010) (Georgia has a public policy favoring arbitration); *Operations Mgmt. Intl., Inc. v. City of Forsyth*, 288 Ga. App. 469, 470 (654 SE2d 438) (2007) ("The purpose of arbitration is to avoid resorting to the courts for dispute resolution"). In ruling on the motion to compel arbitration, the trial court was permitted to make factual determinations from evidence outside the pleadings, and the trial court should have analyzed the facts and relevant law with this posture in mind. See OCGA § 9-9-6 (a) (allowing trial court to "summarily hear and decide the issue").

By applying a motion-for-summary-judgment standard – and applying it improperly – the trial court required Kindred Nursing Centers to establish the absence of any evidence of incapacity and impermissibly shifted the burden of proving incapacity from the Chrzanowskis to Kindred Nursing Centers. Cf. *Freeman v. Ggnsc*

14

*Rome, LLC*, 4:15-CV-0165-HLM, 2015 WL 10960943, *5 (II) (A) (ND Ga. Oct. 26, 2015) (party challenging enforcement of arbitration agreement bears burden of establishing defense). We therefore vacate the trial court's order and remand this case for further proceedings. On remand, the trial court should consider whether the Chrzanowskis have met their burden of showing that Jeanne lacked the capacity to sign the ADR Agreement at the moment she signed it. In so holding, we express no opinion as to whether the Chrzanowskis can meet this burden, but the trial court is authorized to make factual determinations about Jeanne's capacity to enter the ADR Agreement based on the evidence before it.

2. In light of our conclusion in Division 1 that the trial court applied the incorrect burden of proof, we need not address Kindred Nursing Centers' other enumerations of error.

*Judgment vacated and case remanded. McFadden and McMillian, JJ., concur.*