**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and BROWN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 21, 2022**

# In the Court of Appeals of Georgia

A20A0773. CL SNF, LLC et al. v. FOUNTAIN.

RICKMAN, Chief Judge.

In *CL SNF, LLC v. Fountain*, 355 Ga. App. 176 (843 SE2d 605) (2020), we affirmed the denial of a motion to compel arbitration filed by CL SNF, LLC d/b/a Clinch Healthcare Center, RWC Healthcare, LLC, PWW Healthcare, LLC, and Beacon Health Management, LLC (collectively, "Clinch") in an action filed against them by Minnie Fountain on behalf of her nephew Leroy Wiggins.[1] In that case, we held that Clinch had failed to establish that Fountain had the authority to sign the applicable arbitration agreement on behalf of Wiggins. Id. at 184 (1). But the Supreme Court of Georgia reversed our decision and remanded the case for further

---

[1] Wiggins is now deceased, and the Georgia Supreme Court granted a motion to substitute parties that allowed Fountain to proceed as Administrator of Wiggins's estate.

consideration in light of its opinion. *CL SNF, LLC v. Fountain*, 312 Ga. 416 (863 SE2d 116) (2021). Accordingly, we vacate our earlier opinion and adopt the opinion of the Supreme Court as our own. In addition, we address the trial court's determination that the arbitration agreement at issue was not enforceable because it was unconscionable as well as other challenges to that agreement. For the reasons that follow, we affirm in part and reverse in part.[2]

As set forth in our prior opinion, the record demonstrates that Wiggins was a mentally incapacitated adult, Fountain was appointed his guardian, and in November 2006, Letters of Guardianship of Adult Ward were issued by the Probate Court of Clinch County. In March 2014, Wiggins was admitted to Clinch Healthcare Center, a skilled nursing facility ("CHC"). In connection with Wiggins's admission, Fountain signed a Facility Admission Agreement, which contained an arbitration clause, and a separate Arbitration Agreement. The parties to the Arbitration Agreement were Clinch Healthcare, referred to as the Facility, and Fountain, referred to as the Resident or Resident's Representative. Wiggins did not sign the Arbitration Agreement.

---

[2] In response to an issue raised in Fountain's supplemental brief, we note that after this case was remanded, it was docketed to this Court's December/Winter 2022 Term.

Pursuant to the Arbitration Agreement,

[A]ny and all claims or controversies arising out of or in any way relating to this Agreement or the Resident's Admission Agreement, including the interpretation of either, or the Resident's stay at, or the care or services provided by, the Facility, or any acts or omissions in connection with such care or services . . . , whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages, and whether sounding in breach of contract, tort, or breach of statutory or regulatory duties (including, without limitation, any claim based on an alleged violation of the state bill of rights for residents of long-term care facilities or federal resident's rights, any claim based on negligence, any claim for damages resulting from death or injury to any person arising out of care or service rendered by the Facility or by any officer, agent, or employee thereof acting within the scope of his or her employment, any claim based on any other departure from accepted standards of health care or safety, or any claim for unpaid nursing home charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted for arbitration.

In addition, the Arbitration Agreement provided that the "Resident has the right to seek legal counsel concerning this Agreement; [t]he signing of the Agreement is not a precondition to admission, expedited admission, or the furnishing of services to the

3

Resident by the Facility; and [t]his Agreement may be revoked by written notice to the Facility from the Resident within thirty (30) days of signature."

Fountain, however, submitted an affidavit in which she averred that she was told that all of the documents she was given had to be signed in order for Wiggins to be admitted to the facility, that no one explained any of the documents to her, and that she was not informed that she had the right to contact an attorney if she had questions about any of the documents. She also averred that she did not discuss the document with Wiggins or seek his permission to sign it.

Fountain alleged in her complaint that while Wiggins was a resident of CHC, he was sexually battered and assaulted on multiple occasions by his roommate and Clinch failed to address the roommate's pattern of behavior, which also extended to sexual assaults against other residents. In response, Clinch answered and filed a motion to compel arbitration under the Arbitration Agreement and to stay proceedings. The trial court denied the motion to compel and concluded that the Arbitration Agreement was unenforceable because it was unconscionable.

Clinch appealed, challenged the trial court's determination that the Arbitration Agreement was unconscionable, and addressed other issues regarding the validity of the Arbitration Agreement that were raised by Fountain in the trial court. Those issues

4

include the existence of consideration for the Arbitration Agreement, the impact of the federal Medicaid Act and its implementing regulations, the applicability of the Federal Arbitration Act, and whether the Arbitration Agreement precludes vindication of Wiggins's rights under Georgia's Bill of Rights for Residents of Long-Term Care Facilities.

Whether a valid and enforceable arbitration agreement exists is a question of law for the court, and we therefore review a trial court's order granting or denying a motion to compel arbitration de novo. OCGA § 13-2-1; *McKean v. GGNSC Atlanta*, 329 Ga. App. 507, 509 (1) (765 SE2d 681) (2014). And the validity of an arbitration agreement is "generally governed by state law principles of contract formation." *Triad Health Mgmt. of Georgia, III v. Johnson*, 298 Ga. App. 204, 206 (2) (679 SE2d 785) (2009); see also *Lynn v. Lowndes County Health Svcs.*, 354 Ga. App. 242, 245 (2), n.3 (840 SE2d 623) (2020) (this principle still applies in cases where the arbitration agreement states that the agreement is to be governed by the Federal Arbitration Act.).

1. We first address whether the trial court erred in determining that the Arbitration Agreement was unconscionable. We conclude that it did so err.

The Supreme Court of Georgia has defined an unconscionable contract as "one that 'no sane man not acting under a delusion would make and that no honest man would take advantage of,' one that is 'abhorrent to good morals and conscience,' and 'one where one of the parties takes a fraudulent advantage of another.'" (Punctuation omitted.) *Innovative Images v. Summerville*, 309 Ga. 675, 684 (3) (b) (848 SE2d 75) (2020), quoting *NEC Technologies v. Nelson*, 267 Ga. 390, 391 (1), n. 2 (478 SE2d 769) (1996).[3] "We examine unconscionability from the perspective of substantive unconscionability, which looks to the contractual terms themselves, and procedural unconscionability, which considers the process of making the contract." (Citation and punctuation omitted.) *Innovative Images*, 309 Ga. at 684-685 (3) (b).

Focusing on the terms of the contract, the trial court determined that the Arbitration Agreement was substantively unconscionable. The trial court declared the agreement "decidedly one-sided" because it required residents, like Wiggins, to surrender their rights to a jury trial for any claim resulting from their stay at CHC

---

[3] The Supreme Court acknowledged that *NEC Technologies* involved a contract that was subject to the Georgia Uniform Commercial Code, but determined that the basic standards cited therein were drawn from common-law unconscionability cases and acknowledged that they had been applied in a non-UCC case. *Innovative Images*, 309 Ga. at 684 (3) (b), n.8.

6

whereas the facility retained its right to a jury trial in all disputes that did not involve nursing home fees. We do not read the scope of the agreement so narrowly.

The Arbitration Agreement provides that "any and all claims or controversies" arising out or relating to the Arbitration Agreement, the Facility Admission Agreement, Wiggins's stay at or the care or services provided by Clinch, including "any acts or omissions in connection with such care or services, . . . shall be submitted for arbitration." It also details a list of claims that are specifically included, preceded by the phrase "including, without limitation." We read that phrase as a term of illustration or enlargement that provides examples of but does not entirely define the claims subject to arbitration. See *Berryhill v. Georgia Community Support & Solutions, Inc.*, 281 Ga. 439, 442 (638 SE2d 278) (2006) (legislature's use of phrase "includes but is not limited to" indicates an intent to broadly illustrate or enlarge); *Bullock v. City of Dallas*, 248 Ga. 164, 167 (2) (c) (281 SE2d 613) (1981) ("The use of 'any' and 'but not limited to' seem calculated to give the most expansive application possible."). Thus, contrary to the trial court's holding, the terms of the Arbitration Agreement designating the claims subject to arbitration are not so one-sided as to be unconscionable. See generally *R. L. Kimsey Cotton Co. v. Ferguson*, 233 Ga. 962, 965 (3) (214 SE2d 360) (1975) (basic test of

7

unconscionability considers whether "clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract").

As for procedural unconscionability, Fountain contends that she felt coerced into signing the admissions documents, including the Arbitration Agreement, because she was desperate to find a place that would care for Wiggins, was told that she had to sign all of the admissions paperwork for him to be admitted, and felt like she could not take the time to read everything in detail or to ask questions. She also points to her lack of legal training or knowledge, including as to the meaning of arbitration, and the failure of anyone at CHC to explain the terms of the documents she was instructed to sign.

Although it would have been preferable for someone affiliated with Clinch to have explained the Arbitration Agreement in a form and manner that Fountain understood, "[p]arties to a contract are presumed to have read their provisions and to have understood the contents. One who can read, must read, for he is bound by his contracts." (Citation and punctuation omitted.) *Wright v. Safari Club*, 322 Ga. App. 486, 493 (4) (745 SE2d 730) (2013). "While a legal excuse, such as fraud, may be

8

shown for failing to read, the fraud must prevent the party from reading the contract." (Citation and punctuation omitted.) Id.

Here, the first page of the Arbitration Agreement stated that it was voluntary and, in bold-faced type, that "EACH OF THE PARTIES IS WAIVING THE RIGHT TO A TRIAL BY JURY, AND INSTEAD, ANY DISPUTES BETWEEN THE PARTIES SHALL BE RESOLVED THROUGH BINDING ARBITRATION." On the signature page, a section entitled "Resident's Understanding of Agreement" stated that signing the agreement was not a precondition to admission or the furnishing of services to the resident by the facility, the resident had the right to seek legal counsel concerning the agreement, and the agreement could be revoked within 30 days of signature. Fountain does not point to evidence that she was unable to read the agreement or that she was precluded from reading it. Although it is not clear whether she was provided a copy of the signed agreement to read later, even if she was not, that is not evidence of unconscionability in the making of the agreement. See *PruittHealth-Augusta, LLC v. Lyell*, 362 Ga. App. 799, 802 (870 SE2d 215) (2022) (Evidence that skilled nursing facility failed to give copies of signed arbitration agreement to resident is not evidence of unconscionability in the making of the agreement). And her lack of legal knowledge or training, without more, will not

9

amount to procedural unconscionability. See id. (any lack of sophistication or economic disadvantage resident may have had in comparison to skilled nursing facility was not sufficient standing alone to support a finding of procedural unconscionability). Thus, Fountain has not shown that the Arbitration Agreement is procedurally unconscionable. See *Innovative Images*, 309 Ga. at 685-686 (3) (b) (complaining party bears burden of proving procedural unconscionability).

2. The trial court correctly rejected Fountain's contention that the Arbitration Agreement was not a valid contract because it lacked consideration.

Georgia law provides that

a promise is good consideration for another promise if there is an absolute mutuality of engagement, so that each party has the right at once to hold the other to a positive agreement. And in cases of mutual promises, where the promise of one party is relied on as a consideration for the other, the promises must be concurrent and obligatory upon each at the same time, in order to render either binding.

(Citation and punctuation omitted.) *Rushing v. Gold Kist*, 256 Ga. App. 115, 119 (3) (567 SE2d 384) (2002). Where, as here, the parties have mutuality of obligation; i.e., both have agreed to submit their claims to binding arbitration, consideration is not lacking. See id.

10

3. Fountain contends that if there is consideration for the Arbitration Agreement, the federal Medicaid Act and its implementing regulations preclude CHC's receipt of that consideration as a precondition of admitting or expediting the admission of Wiggins to CHC. The trial court concluded, however, that enforcement of the Arbitration Agreement was not prohibited on that basis because its execution was not a precondition to admission. We agree with the trial court.

In its requirements for nursing facilities, and specifically those related to residents's rights, the federal Medicaid Act provides:

> With respect to admissions practices, a nursing facility must[,] in the case of an individual who is entitled to medical assistance for nursing facility services, not charge, solicit, accept, or receive, in addition to any amount otherwise required to be paid under the State plan under this subchapter, any gift, money, donation, or other consideration as a precondition of admitting (or expediting the admission of) the individual to the facility or as a requirement for the individual's continued stay in the facility.

42 USCA § 1396r (c) (5) (A) (iii); see also 42 CFR § 483.1 (a) (4) (for Medicaid-eligible persons, "a nursing facility must not charge, solicit, accept, or receive, in addition to any amount otherwise required to be paid under the State plan, any gift, money, donation, or other consideration as a precondition of admission, expedited

11

admission or continued stay in the facility"). As the trial court recognized, these provisions do not impact the enforceability of the Arbitration Agreement because it specifically provided that "the signing of this Agreement is not a precondition to admission, expedited admission, or the furnishing of services to the Resident by the Facility."

4. The trial court correctly rejected Fountain's contention that the Federal Arbitration Act, 9 USC § 1 et seq. ("FAA"), does not apply and that, as a result, Georgia law prohibits arbitration of her claims.

The Arbitration Agreement stated that the agreement would be governed by the FAA, as opposed to state arbitration law. The FAA provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 2. Fountain contends that the Arbitration Agreement does not "involve commerce" for purposes of the FAA.

The United States Supreme Court has interpreted the term "involving commerce" in the FAA as the functional equivalent of the term "affecting commerce" and concluded that the use of those terms "signals an intent to exercise Congress'

12

commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U. S. 265, 277 (3) (115 SCt 834, 130 LEd2d 753) (1995). The Supreme Court also has clarified that "Congress' Commerce Clause power may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice subject to federal control." (Citation and punctuation omitted.) *Citizens Bank v. Alafabco*, 539 U. S. 52, 56-57 (II) (123 SCt 2037, 156 LEd2d 46) (2003).

Here, Clinch presented evidence that CHC was located in Homerville, Georgia; that the facility's licensed operator and its management company were located in Tampa, Florida; that the facility purchased medical supplies from vendors in Illinois and Wisconsin; and that the facility treated out-of-state patients and processed claims for patients insured through Medicare and Medicaid and private insurance providers, some of which were located outside of Georgia. Based on similar evidence, this Court concluded that a nexus between nursing home operations and interstate commerce had been established. See *Triad Health*, 298 Ga. App. at 205 (1). Although the arbitration provision in *Triad Health* was part of an admission contract, not a separate agreement, the proper focus here is the provision of nursing home care in the aggregate. See *Citizens Bank v. Alafabco*, 539 U. S. at 57 (II) (transactions taken

13

alone not required to have substantial effect on interstate commerce, only "general practice need bear on interstate commerce in a substantial way"). Given the evidence presented here, "and in light of the United States Supreme Court's expansive interpretation of commerce for purposes of the FAA, we conclude that the [Arbitration Agreement] was a contract evidencing a transaction involving commerce, and the FAA therefore applies." *Triad Health*, 298 Ga. App. at 205-206 (1).

Fountain contends that the Georgia Arbitration Act, and more specifically, OCGA §§ 9-9-2 (c) (10) and 9-9-62,[4] preclude arbitration of her claims. This claim fails because the Arbitration Agreement provided that it would be governed by the FAA, and this Court has previously held that the FAA preempts OCGA § 9-9-2 (c) (10) and 9-9-62. See *Davidson v. A.G. Edwards & Sons*, 324 Ga. App. 172, 173 (1) (a) (748 SE2d 300) (2013) ("the FAA preempts OCGA § 9-9-2 (c) (10), insofar as it

---

[4] The Georgia Arbitration Code expressly excludes from coverage "[a]ny agreement to arbitrate future claims arising out of personal bodily injury or wrongful death based on tort," OCGA § 9-9-2 (c) (10), and for medical malpractice claims, provides that "no agreement to arbitrate shall be enforceable unless the agreement was made subsequent to the alleged malpractice and after a dispute or controversy has occurred and unless the claimant is represented by an attorney at law at the time the agreement is entered into." OCGA § 9-9-62.

14

exempts from arbitration 'personal bodily injury' claims"); *Triad Health*, 298 Ga. App. at 209 (3) (OCGA § 9-9-62 is preempted by the FAA).[5]

5. Fountain contends that the Arbitration Agreement was not enforceable because it may preclude the vindication of Wiggins's claim under Georgia's Bill of Rights for Residents of Long-term Care Facilities. The trial court did not issue a definitive ruling on this issue, stating that Fountain had not supplied sufficient case law or argument.

"[A]n appellate court is, among other things, a court for the correction of errors of law," and "[a]n error of law has as its basis a specific ruling made by the trial court." (Citation and punctuation omitted.) *City of Gainesville v. Dodd*, 275 Ga. 834, 837 (573 SE2d 369) (2002). Because there has been no definitive ruling by the trial

---

[5] The recent United States Supreme Court decision cited by Fountain in her supplemental brief does not change this result. In Morgan v. Sundance, ___ U. S. ___ (Case No. 21-328; decided May 23, 2022), the Supreme Court recognized that the FAA's "policy favoring arbitration" is to make "arbitration agreements as enforceable as other contracts, but not more so." (Citation and punctuation omitted.) Id. Accordingly, the Supreme Court instructed that "a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation." Id. Our decision in this case is consistent with the FAA's policy to place arbitration agreements "upon the same footing as other contracts." (Citation and punctuation omitted.) Id.

court on this issue, there is no ruling to review for legal error. See id.; *Owensby v. Williams*, 355 Ga. App. 695, 699 (c) (843 SE2d 899) (2020).

And even if the trial court's statement could be construed as a definitive ruling, Fountain has not pointed to any provision of the Arbitration Agreement that would preclude her from pursuing any available claims under Georgia's Bill of Rights for Residents of Long-Term Care Facilities. See generally *Thurman v. Pruitt Corp.*, 212 Ga. App. 766, 768-769 (2) (442 SE2d 849) (1994) (OCGA § 31-8-126 (a) "provides a cause of action for damages against a long-term care facility for failure to provide certain rights guaranteed under OCGA § 31-8-100 et seq., known as the 'Bill of Rights for Residents of Long-Term Care Facilities.'").

As previously stated, the scope of the Arbitration Agreement covers "any and all claims or controversies" arising out or relating to the Arbitration Agreement, the Facility Admission Agreement, Wiggins's stay at or the care or services provided by Clinch, including "any acts or omissions in connection with such care or services," and allows arbitration of "disputes that would constitute a legally cognizable cause of action in a court of law." The arbitrators may grant any remedy or relief within that scope and "consistent with applicable law." An award of punitive damages is not precluded, but requires the arbitrators to address "every question of law and fact that

16

a court or factfinder would be required to address." Thus, the Arbitration Agreement does not preclude Fountain from pursuing any substantive rights that may be afforded by the statute; it only requires the resolution of those rights in an arbitral, rather than a judicial, forum.

6. Fountain contends that issues remain with respect to whether any of the named defendants in the action below had the right to enforce the Arbitration Agreement because they were not parties to the agreement.

Fountain mentioned this argument in her brief in opposition to Clinch's motion to compel arbitration, but it was not included in the list of reasons for which Fountain argued the trial court should deny Clinch's motion, and the trial court did not specifically address it in its order denying the motion. As previously stated, where there has been no definitive ruling by the trial court on an issue, there is no ruling for this Court to review for legal error. See *Williams v. Williams*, 362 Ga. App. 839, 848 (4) (a), n.9 (870 SE2d 462) (2022); *Lend A Hand Charity v. Ford Plantation Club*, 338 Ga. App. 594, 595 (1) (791 SE2d 180) (2016).

To summarize, with respect to Fountain's claim that she lacked authority under the Guardianship Code to enter the Arbitration Agreement on Wiggins's behalf, we adopt the Supreme Court of Georgia's decision in *Fountain*, 312 Ga. 416, as our own.

In addition, we reverse the trial court's decision that the Arbitration Agreement was unconscionable, and we affirm the trial court's decision to reject Fountain's claims that the Arbitration Agreement was not valid because it lacked consideration, that enforcement of the Arbitration Agreement was precluded by the federal Medicaid Act and its implementing regulations, that the FAA did not apply, and that the Arbitration

Agreement was not enforceable because it precludes vindication of Wiggins's rights under Georgia's Bill of Rights for Residents of Long-Term Care Facilities.[6]

*Judgment affirmed in part and reversed in part. Dillard, P. J., and Brown, J., concur.*

---

[6] We note that recent authority from this Court, *Emory Healthcare v. van Engelen*, 362 Ga. App. 818 (870 SE2d 223) (2022), is distinguishable from this case. In *van Engelen*, this Court upheld the trial court's determination that there was no valid and enforceable agreement requiring arbitration of claims brought by parents on behalf of their baby because "the clear and unambiguous terms on the face of each agreement show that [the pregnant mother] signed the contracts in her personal capacity, not in a representative capacity on behalf of her unborn baby." (Emphasis omitted.) Id. at 825. But here, Fountain was not a resident signing the agreement for her own admission to CHC, Fountain placed her signature on the "Resident Representative Signature" line, under the separate line designated for the resident's signature, and Wiggins's name was written on the "Name of Resident" line. In addition, the undisputed evidence shows that at the time of Fountain's execution of the Arbitration Agreement, the Letters of Guardianship appointing Fountain as Wiggins's guardian were in effect. These circumstances clearly distinguish this case from *van Engelen*, which, contrary to Fountain's contention, does not require us to affirm the trial court's denial of Clinch's motion to compel arbitration. See *Triad Health*, 298 Ga. App. at 207 (2) (although son only checked box for "immediate family member" when executing admission contract with arbitration provision, fact that he held general power of attorney at the time was sufficient to bind his father to agreement).