**November 7, 2014**

# In the Court of Appeals of Georgia

A14A1396. McKEAN et al. v. GGNSC ATLANTA, LLC et al.

BRANCH, Judge.

Acting individually and as executor of his mother Patricia's estate, Dwayne McKean filed suit for wrongful death in the State Court of Fulton County alleging that the defendants' negligence in providing nursing home care to his mother caused her pain and suffering and death. The defendants moved to dismiss, to compel arbitration, and to stay discovery based on an arbitration agreement that McKean signed ostensibly on his mother's behalf when she was admitted to the nursing home. McKean argued that he did not have authority to sign for his mother at the time, but the trial court found that McKean was authorized to bind his mother and her estate's successors and assigns to the arbitration agreement. McKean appeals that decision. For the reasons that follow, we reverse.

The record contains the few relevant facts. Patricia was admitted to the Golden Living Center nursing home on March 9, 2012; she was suffering from the recent onset of paraplegia[1] due to a subarachnoid hemorrhage.[2] At the time, Patricia had not executed any form of power of attorney appointing McKean or anyone else as her attorney-in-fact. On the day of his mother's admission, McKean signed a nursing home admission agreement, which is not in the record, and a separate "Alternative Dispute Resolution Agreement" (the "ADR agreement"). The ADR agreement provides that any dispute between the parties to the agreement "shall be resolved exclusively by an ADR process." The agreement provides that it is not a condition of admission to the facility, but that upon execution by the resident, it becomes a part of the admission agreement. Finally, the ADR agreement provides that the resident has an option to revoke the agreement "within thirty (30) days of signing it."

McKean signed below the blank signature line for the Resident in a space for "Signature of Resident's Legal Representative." Immediately below McKean's

---

[1] A National Institutes of Health web site defines paraplegia as "[p]aralysis of the lower half of your body, including both legs." See http://www.nlm.nih.gov/medlineplus/paralysis.html.

[2] A National Institutes of Health web site defines subarachnoid hemorrhage as "bleeding in the area between the brain and the thin tissues that cover the brain." See www.nlm.nih.gov/medlineplus/ency/article/000701.htm.

signature is an acknowledgment that states, "By my signature, I represent that I am a person duly authorized by Resident or by law to execute this Agreement and that I accept its terms." The agreement required McKean to "Specify Capacity of Legal Representative (e.g., Power of Attorney, Agent, Next of Kin)," for which McKean indicated that his capacity to sign was "Son." There is no evidence in the record that Patricia was present when McKean signed the agreements or that she had knowledge of the ADR agreement on the day it was signed or at any time thereafter.

Nineteen days after McKean signed these agreements, his mother executed a durable power of attorney appointing McKean as her attorney-in-fact and giving McKean authority, among other things, to sign arbitration agreements: i.e., authority

> To act for [Patricia] in all legal matters, . . . including but not limited to the authority to . . . sign all documents, submit claims to arbitration or mediation, settle claims, and pay judgments and settlements; and exercise all powers with respect to legal actions that I could if present and under no disability."

Patricia continued to reside at the nursing home for 40 days after naming McKean as her legal representative. During that time, Patricia developed serious medical issues and she died on May 19, 2012. McKean later filed this suit in the State Court of Fulton County in his capacity as "the expected executor of the estate of Patricia

3

McKean, and individually as a surviving child." The trial court thereafter granted the defendants' motion to dismiss and compel arbitration, apparently on the basis that McKean ratified his own signature by not revoking the ADR agreement after he became his mother's attorney-in-fact and because he represented on the ADR agreement that he was authorized to sign the agreement on his mother's behalf.[3] McKean appeals.

1. Whether a valid and enforceable arbitration agreement exists is a question of law for the court. OCGA § 13-2-1; *Miller v. GGNSC Atlanta*, 323 Ga. App. 114, 117 (1) (746 SE2d 680) (2013). We therefore review a trial court's order granting or denying a motion to compel arbitration de novo. Id. The appellees, as the parties seeking arbitration, bear the burden of proving the existence of a valid and enforceable agreement to arbitrate. *Ashburn Health Care Center v. Poole*, 286 Ga. App. 24, 25 (648 SE2d 430) (2007). And the validity of an arbitration agreement is

---

[3] The trial court wrote,

> After becoming Ms. McKean's attorney-in-fact within the thirty (30) day revocation period of the agreement, Plaintiff did nothing to revoke it. . . . Furthermore, the signature line indicates that Plaintiff was acting as Ms. McKean's agent as it read "I am a person duly authorized by Resident or by law to execute this Agreement."

"generally governed by state law principles of contract formation." *Triad Health Mgmt. of Ga., III v. Johnson*, 298 Ga. App. 204, 206 (2) (679 SE2d 785) (2009) (citations omitted).

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." OCGA § 13-3-1. Because the record shows that Patricia did not personally assent to the ADR agreement, the appellees' position depends on a finding that McKean had authority to sign or that his mother, or McKean acting on her behalf, later ratified his act of signing the ADR agreement.

(a) Under Georgia law, "[t]he relation[ship] of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. Here, there is no evidence that Patricia, prior to or at her admission to the nursing home, gave McKean express authority to enter into the ADR agreement on her behalf. Without evidence of express authority, we turn to apparent or implied authority.[4]

---

[4] Georgia courts have used the terms 'apparent,' and 'implied' authority interchangeably. See *Zanac, Inc. v. Frazier Neon Signs*, 134 Ga. App. 501, 503-504 (2) (215 SE2d 265) (1975).

Apparent authority requires evidence of words or conduct by Patricia suggesting that she gave her son authority:

> apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the *principal* which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

*Howard v. St. Paul Fire & Marine Ins. Co.*, 180 Ga. App. 802, 804 (1) (350 SE2d 776) (1986) (emphasis in original). The appellees have not presented any evidence of words or conduct by Patricia that could cause the nursing home to believe that McKean had apparent authority to sign the arbitration agreement on her behalf. No evidence has been introduced regarding her behavior at the time she was admitted to the nursing home. And McKean's own action of signing the agreement as his mother's agent is insufficient to create agency: "[A]ny manifestations of implied agency or apparent authority arising only through the words or acts of [the purported agent] are insufficient to authorize a finding that an agency existed." *Walker v. Williams*, 177 Ga. App. 830, 832 (341 SE2d 487) (1986) (citation omitted). See also *Omni Builders Risk v. Bennett*, 313 Ga. App. 358, 360 (1) (721 SE2d 563) (2011)

6

("Apparent authority is that which the principal's conduct leads a third party reasonably to believe the agent has.") (citation and punctuation omitted).

Finally, the simple fact that McKean is Patricia's son is insufficient to establish agency. See, e.g, *Life Care Centers of America v. Smith*, 298 Ga. App. 739, 743 (1) (681 SE2d 182) (2009) (arbitration agreement not enforceable when signed by daughter who held her mother's health care power of attorney but where that power did not authorize daughter to enter into arbitration agreements); *Triad Health*, 298 Ga. App. at 207 (2) (son's relationship to incapacitated father was not "in itself sufficient to establish that [son] was his father's agent" for purposes of signing agreement to arbitrate); *Ashburn Health Care*, 286 Ga. App. at 26 (marriage alone does not establish an agency relationship and therefore arbitration agreement signed by husband when wife entered nursing home was not binding on wife or her estate).

(b) Because there is no evidence that Patricia gave express or implied authority to McKean or that McKean had apparent authority to sign the agreement on her behalf, we examine ratification. See OCGA § 10-6-1 (requiring either authorization or ratification by the principle to create agency). The appellees contend that McKean's action of entering into the ADR agreement on her behalf was ratified in two ways: (1) Patricia ratified McKean's act when, nineteen days after McKean

signed the ADR agreement, she gave McKean power of attorney to enter into arbitration agreements on her behalf; or (2) after being granted the power of attorney, McKean, now standing in his mother's shoes, did not exercise the option to revoke the ADR agreement as provided therein, thereby ratifying his earlier act of signing the ADR agreement.

Ratification of an act may be express or implied, including by the silence of the principal, but the principal must have full knowledge of all material facts:

> It has long been the law in Georgia that a ratification by the principal relates back to the act ratified, and takes effect as if originally authorized. A ratification may be express, or implied from the acts or silence of the principal. Where a principal is informed by his agent of what he has done, the principal must express his dissatisfaction within a reasonable time, otherwise his assent to his agent's acts will be presumed. Unless the principal repudiates the act promptly or within a reasonable time, a ratification will be presumed. But in order for a ratification to be binding, the principal must have had full knowledge of all material facts.

*Merritt v. Marlin Outdoor Advertising*, 298 Ga. App. 87, 91 (2) (b) (679 SE2d 97) (2009) (punctuation and footnotes omitted). See also OCGA § 10-6-52 ("A ratification may be express or implied from the acts or silence of the principal."); Rest. (Third) Of Agency § 4.06 (2006) ("A person is not bound by a ratification made

8

without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge.").

Here, there is no evidence that Patricia had knowledge at any time of the ADR agreement, let alone that her son already had executed one on her behalf. Thus, the appellees have not satisfied their burden of proving that at the time Patricia granted McKean the power to enter into arbitration agreements, she had knowledge that he had already done so. Accordingly, the simple fact that Patricia granted McKean power of attorney to act on her behalf did not ratify his earlier action of signing the ADR agreement on her behalf. See *Ellis v. Fuller*, 282 Ga. App. 307, 310 (2) (638 SE2d 433) (2006) (for ratification to occur a principal must know of the agent's unauthorized act); *Bresnahan v. Lighthouse Mission*, 230 Ga. App. 389, 391 (2) (496 SE2d 351) (1998) ("For ratification to be effective, the principal must know of the agent's unauthorized act and, with full knowledge of all the material facts, accept and retain the benefits of the unauthorized act.") (citation omitted).

The appellees counter that because Patricia gave McKean the specific authority to enter into arbitration agreements in the future, she necessarily ratified any arbitration agreements that he had already entered into. They also argue that it is sufficient to show that McKean had knowledge of all the material facts because, as

attorney in fact, McKean was acting in the place of his mother and he therefore had the necessary knowledge to ratify his earlier execution of the ADR agreement on behalf of his mother. We find no binding authority for these arguments. And we do not agree that a principal necessarily ratifies prior acts by the attorney-in-fact when a principal grants someone power of attorney to perform those acts on behalf of the principal in the future, or that the attorney-in-fact himself is necessarily authorized to ratify all previous actions he or she previously has taken in the principal's name without the principal's knowledge. See *Dobbins v. Blanchard*, 94 Ga. 500 (21 SE 215) (1894) (power of attorney appointing husband to act for wife and expressly ratifying all his acts made for her "after this date" is not authority for, or ratification of, acts taken by husband prior to power of attorney).

The case of *Thompson v. Fed. Express Corp.*, 809 F.Supp 950 (M.D. Ga. 1992), upon which the appellees rely, is distinguishable and not persuasive authority for the present case.[5] In *Thompson*, in July 1989, without authority from her husband who was incapable of signing for himself, a wife signed a subrogation agreement on

[5] Although potentially persuasive, federal district court precedent is not binding on this Court. *Macon-Bibb County Hosp. Auth. v. Nat. Treasury Employees Union*, 265 Ga. 557, 558 (1) (458 SE2d 95) (1995); *Winburn v. McGuire Investment Group*, 220 Ga. App. 384, 385 (1) (469 SE2d 477) (1996).

10

her husband's behalf that his employer required as a condition of her husband receiving medical expense and disability benefits provided by his employer as a result of an automobile accident with a third party; the wife even applied for some of the benefits on her husband's behalf. Id. at 952. Almost two years later, the wife was appointed guardian of her husband's person and property. Id. Both before and after she was appointed as her husband's guardian, the wife received and deposited benefit checks from her husband's employer. Id. The district court found that although the wife had no legal authority to sign for her husband at the time, the subrogation agreement was enforceable against the husband because the wife ratified the agreement by accepting the employer's benefits after having been named guardian with the knowledge that she had previously signed the reimbursement agreement on his behalf. Id. at 954. Thus, without any citation to authority – Georgia or otherwise – the district court concluded that the wife "ratified her earlier signing of the reimbursement agreement." Id.

Even setting aside the lack of cited authority for the district court's conclusions, the case is distinguishable because in the present case, there is no evidence that Patricia or McKean acting on her behalf ever accepted any benefits of the ADR agreement. Neither McKean nor his mother ever sought any of the

11

theoretical benefits of alternative dispute resolution, such as reduced costs as compared to litigation.[6] The appellees, therefore, have not shown that Patricia or McKean accepted any benefits of the ADR agreement. For these reasons, we find *Thompson v. Federal Express* to be inapplicable. The case of *Lankford v. Orkin Exterminating Co.* is distinguishable for essentially the same reason. 266 Ga. App. 228, 229-230 (1) (597 SE2d 470) (2004) (where mother signed pest control agreement "for" her daughter/homeowner, with whom she lived, both mother and daughter were bound by arbitration clause in agreement where they both accepted the benefits of, paid for, and signed for pesticide treatments for the home and where the mother filed suit alleging breach of the contract that contained the arbitration clause).

For the above reasons, we conclude that the appellees have failed to carry their burden of showing that Patricia McKean assented to the ADR agreement or that she ratified her son's action of signing the ADR agreement on her behalf. Accordingly, the trial court erred by concluding that a valid and enforceable agreement to arbitrate exists.

---

[6] Although Patricia accepted the benefits of admission to the nursing home, the nursing home admission agreement is not in the record. Thus, even though the ADR agreement states that it is incorporated by reference into the admission agreement, without more, we cannot conclude that Patricia, or McKean acting on her behalf, accepted the benefits of the ADR agreement by accepting nursing home care.

2. The appellees also contend that the ADR agreement can be enforced because Patricia was a third-party beneficiary to the ADR agreement. The premise of this argument is flawed. The ostensible parties to the ADR agreement are the nursing home and Patricia, and McKean attempted to sign the agreement as his mother's representative. The fact that the agreement fails because Patricia never consented to its terms does not promote McKean, who did not sign the agreement in his individual capacity, to the position of being a party to the agreement such that the appellees can argue that his mother was a third-party beneficiary thereto. Several cases from other jurisdictions cited by the defendants are distinguishable because in those cases, the person signing the arbitration agreement signed for the patient and in a second capacity. See *JP Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 600 (5th Cir. 2007) (where mother on behalf of incompetent daughter signed nursing home agreement that was "with, or on behalf of, [daughter] and/or her family," arbitration agreement contained therein could be enforced against daughter under federal law); *THI of S. Carolina at Columbia, LLC v. Wiggins*, (Case No. CA-3:11-888-CMC, decided Sept 13, 2011) (D. S.C. 2011) (under South Carolina law, where daughter signed nursing home contract with arbitration clause for her father "and/or" as a "fiduciary party," father was bound to arbitration clause as a third-party beneficiary to the contract).

13

Moreover, there are other jurisdictions that reject the defendants' third-party beneficiary arguments. See, e.g., *Licata v. GGNSC Malden Dexter LLC*, 2 NE3d 840 (Mass. 2014).

3. Without citation of authority, the defendants also claim that McKean should be estopped or otherwise equitably barred from avoiding arbitration because he signed the ADR agreement and his mother later granted him power of attorney. But in general, estoppels are not favored by the law. *White v. White*, 274 Ga. 884, 885 (1) (561 SE2d 801) (2002). And the party asserting the benefit of estoppel "must have acted in good faith, and must have exercised reasonable diligence." *Collins v. Grafton*, 263 Ga. 441, 443 (2) (435 SE2d 37) (1993); *Cedartown N. Partnership, LLC v. Georgia Dept. of Transp.*, 296 Ga. App. 54, 56 (1) (673 SE2d 562) (2009). Here, the ADR agreement required McKean to indicate his capacity for signing on behalf of his mother, and McKean indicated that he signed as his mother's "son." As shown above, this notation does not provide a legal basis for an agency relationship; the notation also strongly suggests that McKean did not have his mother's power of attorney, was not acting as her guardian or conservator, and had no other legal basis for claiming to have authority to sign the ADR agreement. Yet the appellees have not shown that they made any further inquiry regarding McKean's capacity to sign. Thus,

14

the appellees failed to present evidence to show that they exercised any diligence to explore McKean's asserted authority in response to McKean essentially indicating that he lacked authority to sign for his mother. We therefore reject the appellees' argument that McKean must arbitrate because he is estopped to deny the validity of the ADR agreement. See *Hogsett v. Parkwood Nursing & Rehab. Center*, 997 F.Supp2d 1318, 1329 (N.D. Ga. 2014) (rejecting argument that daughter, who had no power of attorney, who signed on behalf of her mother on a nursing home arbitration agreement was thereby precluded from pursing a wrongful death claim in her individual capacity).

For the foregoing reasons, we reverse the decision of the trial court.

*Judgment reversed. Barnes, P. J., and Boggs, J., concur*.