**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 19, 2020**

# In the Court of Appeals of Georgia

A20A0773. CL SNF, LLC et al. v. FOUNTAIN.

RICKMAN, Judge.

Following the grant of their application for interlocutory appeal, CL SNF, LLC d/b/a Clinch Healthcare Center, RWC Healthcare, LLC, PWW Healthcare, LLC, and Beacon Health Management, LLC (collectively, "Clinch") appeal the trial court's order denying their motion to compel arbitration in an action filed by Minnie Fountain on behalf of her nephew Leroy Wiggins. Clinch contends that the trial court erred in finding the arbitration agreement at issue to be unconscionable and denying their motion to compel arbitration. For reasons that follow, we affirm the trial court's order because Wiggins's guardian did not have authority to sign the arbitration agreement on his behalf.

Wiggins is a mentally incapacitated adult. Fountain was appointed his guardian, and in November 2006, Letters of Guardianship of Adult Ward were issued by the Probate Court of Clinch County. In March 2014, Wiggins was admitted to Clinch Healthcare Center, a skilled nursing facility located in Homerville, Georgia. In connection with Wiggins's admission, Fountain signed a Facility Admission Agreement, which contained an arbitration clause, and a separate Arbitration Agreement. The parties to the Arbitration Agreement were Clinch Healthcare, referred to as the Facility, and Fountain, referred to as the Resident or Resident's Representative. Wiggins did not sign the Arbitration Agreement, and when Fountain signed it, she did not complete the portion of the form asking her to indicate the capacity in which she had signed.

Pursuant to the Arbitration Agreement,

[A]ny and all claims or controversies arising out of or in any way relating to this Agreement or the Resident's Admission Agreement, including the interpretation of either, or the Resident's stay at, or the care or services provided by, the Facility, or any acts or omissions in connection with such care or services . . . , whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages, and whether sounding in breach of contract, tort, or breach of statutory or regulatory duties (including, without limitation, any claim based on an alleged violation

2

of the state bill of rights for residents of long-term care facilities or federal resident's rights, any claim based on negligence, any claim for damages resulting from death or injury to any person arising out of care or service rendered by the Facility or by any officer, agent, or employee thereof acting within the scope of his or her employment, any claim based on any other departure from accepted standards of health care or safety, or any claim for unpaid nursing home charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted for arbitration.

In addition, the Arbitration Agreement provided that the "Resident has the right to seek legal counsel concerning this Agreement; [t]he signing of the Agreement is not a precondition to admission, expedited admission, or the furnishing of services to the Resident by the Facility; and [t]his Agreement may be revoked by written notice to the Facility from the Resident within thirty (30) days of signature."

Fountain, however, submitted an affidavit in which she averred that she was told that all of the documents she was given had to be signed in order for Wiggins to be admitted to the facility, that no one explained any of the documents to her, and that she was not informed that she had the right to contact an attorney if she had questions about any of the documents. She also averred that she did not discuss the document with Wiggins or seek his permission to sign it.

According to the complaint filed by Fountain, in 2017, while Wiggins was a resident of Clinch Healthcare Center, he was sexually battered and assaulted on multiple occasions by his roommate and Clinch failed to address the roommate's pattern of behavior, which extended to sexual assaults against at least five other residents. The complaint alleged numerous causes of action against Clinch based on alleged negligence in Clinch's care of Wiggins. In response, Clinch answered and filed a motion to compel arbitration and stay proceedings. The trial court denied the motion to compel based on its conclusion that the Arbitration Agreement was unconscionable and its determination that the arbitration clause in the Facility Admission Agreement was unenforceable because it did not state that acceptance of arbitration was not a precondition to admission.

On appeal, Clinch contends that the trial court erred in determining that the Arbitration Agreement was unconscionable and also addresses other issues regarding the validity of the Arbitration Agreement that were raised by Fountain and rejected by the trial court.[1] Those issues include Fountain's authority to sign the Arbitration Agreement for Wiggins, the applicability of the Federal Arbitration Act, the existence

---

[1] Clinch does not enumerate as error the trial court's determination that the arbitration clause in the Facility Admission Agreement was unenforceable and we therefore limit our analysis to the validity of the separate Arbitration Agreement.

4

of consideration for the Arbitration Agreement, whether the Arbitration Agreement precludes vindication of Wiggins's rights under the Bill of Rights for Residents of Long-Term Care Facilities, the impact of Medicaid regulations, and whether questions of standing or privity remain.

1. We first address whether Fountain had the authority to sign the Arbitration Agreement on behalf of Wiggins. Fountain raised this issue in response to Clinch's motion to compel arbitration, and the trial court determined that the powers granted under the Guardianship Code, specifically those powers found in OCGA § 29-4-23 (a) (3), were sufficient to authorize Fountain to bind Wiggins to the agreement.

Whether a valid and enforceable arbitration agreement exists is a question of law for the court, and we therefore review a trial court's order granting or denying a motion to compel arbitration de novo. OCGA § 13-2-1; *McKean v. GGNSC Atlanta*, 329 Ga. App. 507, 509 (1) (765 SE2d 681) (2014). As the party seeking arbitration, Clinch bears the burden of proving the existence of a valid and enforceable agreement to arbitrate. *Ashburn Health Care Center v. Poole*, 286 Ga. App. 24, 25 (648 SE2d 430) (2007). And the validity of an arbitration agreement is "generally governed by state law principles of contract formation." *Triad Health Mgmt. of Georgia, III v. Johnson*, 298 Ga. App. 204, 206 (2) (679 SE2d 785) (2009); see also *Lynn v.*

*Lowndes County Health Svcs.*, ___ Ga. App. ___ (2), n.3 (Case No. A19A2057; decided March 9, 2020) (This principle still applies in cases where the arbitration agreement states that the agreement is to be governed by the Federal Arbitration Act.).

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." OCGA § 13-3-1. Where, as here, a guardian is appointed for an incapacitated adult, the ward loses the power to make a contract, unless the court's order specifies that the power will be retained. OCGA § 29-4-21 (a) (2). The record does not show that Wiggins retained this power. The Arbitration Agreement contemplates execution by the Resident and the Resident Representative and has a space for the Resident Representative to indicate the capacity of his or her representation, with examples including "guardian, attorney-in-fact, agent under Durable Power of Attorney for Healthcare, spouse, son, daughter, etc." As previously noted, Wiggins did not sign the agreement and Fountain did not indicate the capacity of her representation. But the Arbitration Agreement also provides that the term "Resident" includes "the Resident, his or her guardian, attorney-in-fact, agent, sponsor, representative, or any person whose claim is derived

6

through or on behalf of Resident," and that if the agreement is signed "by the Resident's representative[,] that individual represents that he or she is authorized and has no reason to believe that the Resident would not have signed this Agreement if he or she were competent and able to do so." Despite this language, which contemplates that Wiggins be bound by the Arbitration Agreement and that Fountain was acting in a representative capacity, "whether [Fountain] had the authority to bind [her nephew] is a separate issue." See *Triad Health Mgmt.*, 298 Ga. App. at 207 (2).

"Traditional principles of agency law may bind a nonsignatory to an arbitration agreement." Id. at 206 (2). "The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. Clinch does not contend that Wiggins expressly or implicitly authorized Fountain to act for him or that he later ratified her act of signing the Arbitration Agreement but contends that the Letters of Guardianship issued by the probate court gave Fountain authority to sign the Arbitration Agreement on his behalf.

Despite the implicit concession that traditional rules of agency do not apply here, Clinch nonetheless argues that *Triad Health Mgmt.*, 298 Ga. App. 204, is "strikingly similar" to this case. In *Triad*, a son filed a negligence action against a

7

nursing home where his incapacitated father was a patient. Id. at 204-205. As part of his father's admission to the facility, the son signed an "Admission Contract," which stated that any dispute arising out of the health care services Triad provided would be resolved by arbitration. Id. at 205. At the time the son signed the Admission Contract, he held a general power of attorney that designated him as his father's attorney "'with full power and authority to do and perform all and every act . . . necessary, requisite or proper to be done, as fully . . . as I might or could do if personally present," and without specific limitation." Id. at 207 (2). This Court held that "[u]nder the circumstances of the transaction, which involved [the father]'s admission into a treatment facility while incapacitated, [the son]'s execution of the Admission Contract on behalf of his father was 'necessary, requisite or proper,' within the scope of the agency contemplated by the power of attorney, and [the father] was bound thereby." Id. at 207-208 (2).

*Triad* is distinguishable, however, because the son in that case held a general power of attorney that gave him the authority to perform any and all necessary acts that his father could perform if personally present, and Fountain did not hold a power of attorney or any other instrument in which Wiggins granted her power to act on his

8

behalf.[2] Instead, Fountain's duties as guardian are set forth in the Letters of Guardianship, which provide that, as guardian, Fountain had the general duty "to protect and maintain the person of the ward" and more specifically, "to see that [Wiggins] is adequately fed, clothed, sheltered and cared for, and that [Wiggins] receives all necessary medical attention." In addition, the Letters of Guardianship provide that Fountain's "authority to act pursuant to these Letters is subject to applicable statutes and to any special orders entered in this case."

---

[2] This distinction should not be construed as a determination that any power of attorney is sufficient to grant its holder authority to sign an agreement to arbitrate on behalf of the grantor. The importance of the specific language used in the granting instrument is illustrated in *Kindred Nursing Centers Ltd. Partnership v. Clark*, 137 SCt 1421 (197 LEd2d 806) (2017), where the United States Supreme Court recognized that the language of a particular power of attorney may be insufficiently broad to give its holder the authority to execute an arbitration agreement for her husband. Id. at 1429 (III). And in an earlier decision of this Court, we held that the plain language of a health care power of attorney awarding its recipient the power "to make any and all decisions for me concerning my personal care, medical treatment, hospitalization, and health care and to require, withhold, or withdraw any type of medical treatment or procedure, even though my death may ensue" did not include the authority to bind her mother "to arbitration of any and all claims arising out of her care at Life Care." *Life Care Centers v. Smith*, 298 Ga. App. 739, 742, 744 (1) (681 SE2d 182) (2009). The court in *Smith* distinguished foreign authority that held otherwise based on the specific language of the healthcare power of attorney. Id. at 742 (1).

9

The applicable statutes referred to in the Letters of Guardianship would include the Guardianship Code, which provides that "[e]xcept as otherwise provided by law or by the court, a guardian shall make decisions regarding the ward's support, care, education, health, and welfare," and shall "[a]rrange for the support, care, education, health, and welfare of the ward, considering the ward's needs and available resources." OCGA §§ 29-4-22 (a), (b) (6). Certain powers are automatically vested in the guardian upon appointment:

> Unless inconsistent with the terms of any court order relating to the guardianship, a guardian may: (1) Take custody of the person of the ward and establish the ward's place of dwelling within this state; (2) Subject to Chapters 9, 20, and 36 of Title 31 and any other pertinent law, give any consents or approvals that may be necessary for medical or other professional care, counsel, treatment, or service for the ward; (3) Bring, defend, or participate in legal, equitable, or administrative proceedings, including alternative dispute resolution, as are appropriate for the support, care, education, health, or welfare of the ward in the name of or on behalf of the ward; and (4) Exercise those other powers reasonably necessary to provide adequately for the support, care, education, health, and welfare of the ward.

OCGA § 29-4-23 (a). Additional powers may be granted to the guardian by the court, as set forth in OCGA § 29-4-23 (b), but no such powers were awarded to Fountain.

10

We must consider whether the powers granted to Fountain as guardian are sufficient to allow her to bind Wiggins to the voluntary pre-dispute Arbitration Agreement, which will require us to construe the terms of OCGA § 29-4-23 (a). When considering the meaning of a statute, "we must presume that the General Assembly meant what it said and said what it meant." (Citation and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013). "To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way." (Citations and punctuation omitted.) Id. at 172-173 (1) (a). "For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question." (Citation and punctuation omitted.) *Tibbles v. Teachers Retirement System of Georgia*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015).

Here, the plain language of subsections (1) and (2) of OCGA § 29-4-23 (a) does not provide Fountain authority to sign the Arbitration Agreement. Those subsections empower a guardian to establish a place of dwelling and provide any

11

necessary consents or approvals for "medical or other professional care, counsel, treatment, or service." Fountain's consent to the voluntary Arbitration Agreement, the signing of which was not a requirement for admission to the facility or the receipt of services, did not fall under either of those powers as it did not serve the purpose of establishing a place for him to live or provide consent for medical or other care or treatment. See generally *Coleman v. United Health Svcs. of Georgia*, 344 Ga. App. 682, 683 (1) (812 SE2d 24) (2018) (where the arbitration agreement was voluntary and "not a precondition to admission, expedited admission, or the furnishing of services," decision to execute the arbitration agreement by holder of advance directive for health care cannot be viewed as a health care decision); *Smith*, 298 Ga. App. at 742 (1) (daughter holding health care power of attorney lacked authority to sign agreement to arbitrate that was not required for her mother to be admitted to Life Care facility).[3]

Subsection (3) of OCGA § 29-4-23 (a) gives a guardian the power to "[b]ring, defend, or participate" in legal, equitable, or administrative proceedings, including

---

[3] For the same reasons, the designation of Fountain's duties in the Letters of Guardianship to feed, clothe, shelter and care for Wiggins and to ensure that Wiggins received all necessary medical attention did not authorize her to sign the Arbitration Agreement.

alternative dispute resolution, if they are "appropriate for the support, care, education, health, or welfare of the ward." To "bring" an action "has a settled customary meaning at law, and refers to the initiation of legal proceedings in a suit." Black's Law Dictionary (6th ed. 1990); see also Merriam-Webster Online Dictionary (2020) ("bring" defined as "to cause to exist or occur," such as institute or bring a legal action). "Defend" means "to contest and endeavor to defeat a claim or demand." Black's Law Dictionary (6th ed. 1990). And "participate" in this context means "to take part." Merriam-Webster Online Dictionary (2020). Fountain's action in signing the pre-dispute Arbitration Agreement is not the equivalent of initiating, contesting, or taking part in any type of proceeding, including alternative dispute resolution. In addition, the type of proceedings that a guardian can initiate or participate in must be appropriate for the support, care, education, health, or welfare of the ward. Although the statutory language would allow Fountain to bring, defend, or participate in a proceeding for those purposes and later determine that those purposes would also be served by engaging in alternative dispute resolution with respect to the claims asserted or defended, the same cannot be said for signing the pre-dispute Arbitration Agreement that waives the right to a jury trial for any potential claim that may arise in the future where such signature was not necessary for Wiggins to be admitted to

13

the facility or to obtain services therefrom, and thus was not applicable to the support, care, education, health, or welfare of the ward.[4] Based on the plain language of this subsection of the statute, Fountain's power to bring, defend, or participate in legal, equitable, or administrative proceedings, including alternative dispute resolution, did not extend to signing the voluntary pre-dispute Arbitration Agreement on behalf of Wiggins.

Our conclusion in this regard is consistent with the general duties of a guardian to "at all times act as a fiduciary in the ward's best interest and exercise reasonable care, diligence, and prudence." OCGA § 29-4-22 (a). The record does not reflect that Fountain's execution of the Arbitration Agreement when Wiggins was admitted to the facility was a decision made in the best interest of the ward, with reasonable care, diligence, and prudence, because signing it was not a condition of admission to the facility and the claims that were bound to arbitration had not yet arisen, making it impossible for her to determine at that time whether waiving Wiggins's right to a jury trial would be in his best interest.

---

[4] OCGA § 29-4-23 (a) (3) would also authorize the guardian to participate in alternative dispute resolution on the ward's behalf if ordered by the court during an authorized proceeding or if the ward had agreed to do so before becoming incapacitated.

We note that prior versions of this statute authorized guardians to compromise all contested or doubtful claims for or against the wards they represented and allowed them to submit such matters to arbitration. See former OCGA § 29-2-16 (2004); Code of 1933, § 49-219. The current statute lacks the language authorizing a guardian to "submit" claims to arbitration and, to the extent the prior language would have authorized a guardian to execute a pre-dispute arbitration agreement covering any claims of the ward, the existing language does not.

We next address subsection (4) of OCGA § 29-4-23, which allows a guardian to exercise "those other powers reasonably necessary to provide adequately for the support, care, education, health, and welfare of the ward." These additional powers must be "reasonably necessary" to provide for the listed needs. As we have previously stated, signing the Arbitration Agreement was optional and not a "precondition to admission, expedited admission, or the furnishing of services to [Wiggins]." In addition, the record does not reflect that signing the Arbitration Agreement was otherwise reasonably necessary to provide for Wiggins's support, care, education, health, or welfare. Because signing the Arbitration Agreement was not reasonably necessary to provide for Wiggins, subsection (4) does not provide Fountain the

15

authority to do so on Wiggins's behalf. See generally *Coleman*, 344 Ga. App. at 683 (1); *Smith*, 298 Ga. App. at 742 (1).

Clinch has failed to establish that Fountain had the authority to sign the Arbitration Agreement on behalf of Wiggins. Accordingly, the Arbitration Agreement is not enforceable against Wiggins, and the trial court properly denied the motion to compel arbitration. See generally *Coleman*, 344 Ga. App. at 685 (1); *United Health Svcs. of Georgia v. Alexander*, 342 Ga. App. 1, 5 (2) (b) (802 SE2d 314) (2017); *Poole*, 286 Ga. App. at 27. Although the trial court found the agreement to be invalid on other grounds, we will affirm a judgment that is right for any reason. See *Poole*, 286 Ga. App. at 27.

2. Given our holding in Division 1, we need not address any other potential issues related to the enforcement of the Arbitration Agreement.

*Judgment affirmed. Dillard, P. J., and Brown, J., concur.*