**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be physically received in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 1, 2022**

# In the Court of Appeals of Georgia

A21A1562. EMORY HEALTHCARE, INC. v. VAN ENGELEN et al.

DILLARD, Presiding Judge.

Emory Healthcare, Inc. appeals from the trial court's denial of its motion to dismiss and compel arbitration in this medical-malpractice and wrongful-death action brought by Ille van Engelen and Jacqueline "Jackie" Kingston van Engelen.[1] Specifically, Emory argues the trial court erred in holding that the plain meaning of the arbitration agreement shows it was not applicable to claims arising from care and treatment provided to the van Engelens' baby, Isabelle, who was unborn at the time

---

[1] The van Engelens brought this action in their individual capacities, as the surviving parents of Isabelle van Engelen, and as co-administrators for her estate.

of the agreement's execution. For the reasons set forth *infra*, we disagree with Emory and affirm the trial court's order.[2]

The record shows Jackie went to Emory Johns Creek Hospital with vaginal bleeding on July 10, 2019, while she was 31 weeks pregnant. She was discharged but returned the next morning on July 11, 2019, this time with vaginal bleeding and contractions. And when Jackie was admitted to the hospital on July 11, 2019, she signed two *identical* copies of Emory's three-page admission/registration agreement.[3] On page two of this agreement was a clause entitled "Agreement to Alternative Dispute Resolution," which provides, in relevant part:

> I agree that any claim or dispute arising out of or related to the provision of health care services to me by Emory, shall be resolved by final and binding arbitration, except as otherwise provided herein. I agree that this provision is governed by the Federal Arbitration Act. I understand and agree that this agreement includes and encompasses any claims arising out of or relating to health care services which shall be provided to me upon this admission as well as all health care services provided to me by Emory in the future, for any future condition(s), regardless of whether

[2] Oral argument was held in this case on October 5, 2021, and is currently archived on the Court's website. *See* Court of Appeals of Georgia, Oral Argument, Case No. A21A1562 (Oct. 5, 2021), available at https://www.gaappeals.us/oav/A21A1562.php.

[3] She also signed a single copy of this same agreement during her visit on July 10, 2019.

the future services are for a wholly unrelated or different condition than the within admission . . . . I understand that this agreement is also binding on any individual or entity claiming by or through me or on my behalf. I understand that this agreement is voluntary and is not a precondition to receiving health care services. . . . NOTE: If the individual signing this agreement is doing so on behalf of his or her minor child or any other person for whom he or she is legally responsible, the signature below affirms that he or she has the authority or obligation to contract with Emory for the provision of health care services to that minor child or other person, and that his or her execution of this agreement is in furtherance of that authority or obligation.

A signature line for the "Patient, Parent, Guardian or Authorized Representative" followed the alternative-dispute-resolution provision. Jackie signed her name under the provision in both agreements presented to her during her admission.[4] The last page of each agreement also contained a signature line for the "patient or patient representative." And directly under *this* line was a line to designate

---

[4] Jackie signed the documents using her maiden name, Kingston, because she had not yet changed her surname after marrying.

the "Relationship of Representative to Patient." Jackie signed her name on the line designated for the "patient or patient's representative" on both documents at 7:24 a.m. and 7:35 a.m., respectively, but on neither agreement did she otherwise indicate her relationship to the patient.

The medical providers were unable to stop Jackie's labor, and baby Isabelle van Engelen was born at 12:26 a.m. on July 12, 2019. And following Isabelle's birth, on the agreement signed by Jackie at 7:24 a.m. on the previous day, the hospital placed a sticker in the upper right-hand portion of each page, which contained the designation "Kingston, J G A" and reflected a date of birth of July 12, 2019; age of 0; female sex; and admission date of July 12, 2019. Tragically, Isabelle never left the hospital and died two weeks later after suffering irreversible brain damage due to oxygen deprivation.[5]

---

[5] Isabelle suffered cardiac arrest in the NICU after an endotracheal tube was placed in her esophagus rather than her trachea for several hours, causing her lungs to collapse.

In November 2020, Jackie and her husband filed a wrongful-death action on behalf of Isabelle, alleging medical malpractice. Emory filed a motion to dismiss and compel arbitration, arguing that the July 11, 2019 agreement signed at 7:24 a.m. compelled arbitration of Isabelle's claims raised in the complaint. The plaintiffs opposed the motion, contending that the arbitration clause did not apply to claims raised on behalf of Isabelle, but only those of Jackie.

The trial court denied Emory's motion, finding there was no valid and enforceable agreement requiring arbitration of the claims brought on behalf of Isabelle. In doing so, the court reasoned that a plain reading of the agreements "fails to show that any of them is applicable to [the child]'s claims," and that the "arbitration agreements applied to any claims of [the mother], individually, and her individual claims are not at issue in this action." The court then certified its order for immediate review, and we granted Emory's application for interlocutory appeal.

We review a trial court's order granting or denying a motion to compel arbitration *de novo*.[6] And Emory, as the party seeking arbitration, bears the burden of

---

[6] *Miller v. GGNSC Atlanta, LLC*, 323 Ga. App. 114, 117 (1) (746 SE2d 680) (2013).

proving the existence of a valid and enforceable agreement to arbitrate.[7] Importantly, whether there is a valid agreement to arbitrate is "generally governed by state law principles of contract formation, and is appropriate for determination by the court."[8] Suffice it to say, "a contract is valid only if the parties assented to the contract terms,"[9] which is commonly indicated by signing the agreement.[10] Accordingly, a party cannot be required to "submit to arbitration any dispute which he has not agreed to submit."[11] But the question here is not whether the agreement signed by Jackie was

---

[7] *Triad Health Mgmt. of Ga., III, LLC v. Johnson*, 298 Ga. App. 204, 206 (2) (679 SE2d 785) (2009).

[8] *Coleman v. United Health Svcs. of Ga., Inc.*, 344 Ga. App. 682, 683 (1) (812 SE2d 24) (2018) (citations & punctuation omitted).

[9] *Id.*

[10] *See Bostwick Banking Co. v. Arnold*, 227 Ga. 18, 23 (178 SE2d 890) (1970) ("A court may take judicial notice that the signature of an individual on the face of a note, at the bottom on the right, without limiting or descriptive words before or after it, is the universal method of signing a contract to assume a personal obligation."); *Century 21 Pinetree Props., Inc. v. Cason*, 220 Ga. App. 355, 356 (2) (a) (469 SE2d 458) (1996) ("Clearly, the best way for [the party] to have indicated its assent to the terms of the written contract would have been to sign the document."). *Cf. Cochran v. Eason*, 227 Ga. 316, 318 (1) (180 SE2d 702) (1971) ("Assent to the terms of a contract may be given other then by signatures.").

[11] *Coleman*, 344 Ga. App. at 683 (1) (punctuation omitted); *accord S. Point Retail Partners, LLC v. N. Am. Props. Atlanta, Ltd.*, 304 Ga. App. 419, 421 (1) (696 SE2d 136) (2010); *see Emory Healthcare, Inc. v. Farrell*, 359 Ga. App. 621, 624 (859 SE2d 576) (2021) ("It is well established that, under both Georgia and federal law, arbitration is a

valid, but rather whether she signed the agreement on behalf of Isabelle. We conclude she did not.[12]

Significantly, the cardinal rule of contract construction is "to ascertain the intention of the parties, *as set out in the language of the contract.*"[13] Indeed, it is well

matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (punctuation omitted)).

[12] Because we conclude the agreement does not encompass the claims at issue, the policy of favoring arbitrability does not apply. *See Farrell*, 359 Ga. App. at 624-25 ("[W]hile ambiguities in the language of an agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." (punctuation omitted)); *West v. Bowser*, 360 Ga. App. 103, 108 (1) (c) (860 SE2d 904) (2021) ("We only apply the presumption of arbitrability to the interpretation of contracts if we have already determined that, under state law, the parties formed a valid agreement to arbitrate. . . . [T]he first task of a court asked to compel arbitration of a dispute *is to determine whether the parties agreed to arbitrate that dispute.* Here, because no valid and enforceable agreement to arbitrate was formed, the federal policy in favor of arbitration does not control." (punctuation omitted)).

[13] *Copeland v. Home Grown Music, Inc.*, 358 Ga. App. 743, 748 (1) (856 SE2d 325) (2021) (punctuation omitted) (emphasis supplied); *accord Shields v. RDM, LLC*, 355 Ga. App. 409, 413 (1) (844 SE2d 297) (2020); *see Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 324 (834 SE2d 800) (2019) ("The cardinal rule of contract construction is to ascertain the intention of the parties." (punctuation omitted)); *Miller*, 323 Ga. App. at 118 (2) ("Under Georgia law, the cardinal rule of contract construction is to ascertain the intent of the parties, as evidenced by the language of the contract.").

7

established that the construction of a contract is "a question of law for the court,"[14]

involving three analytical steps:

> The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury [or the trial court at a bench trial].[15]

So, when the terms of a contract are clear and unambiguous, the reviewing court

"looks *only to the contract itself* to determine the parties' intent."[16]

---

[14] *Copeland*, 358 Ga. App. at 748 (1) (punctuation omitted); *accord Shields*, 355 Ga. App. at 413 (1); *see Farrell*, 359 Ga. App. at 624-25 ("[T]he question of arbitrability—*i.e.*, whether an agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." (punctuation omitted)).

[15] *Copeland*, 358 Ga. App. at 748 (1) (punctuation omitted); *accord Shields*, 355 Ga. App. at 413 (1); *Stanley v. Gov't Emps. Ins. Co.*, 344 Ga. App. 342, 344 (1) (810 SE2d 179) (2018).

[16] *Langley*, 307 Ga. at 324 (punctuation omitted) (emphasis supplied); *see Farrell*, 359 Ga. App. at 625 ("[W]hen the language of a contract is plain and unambiguous, no construction is required or permissible and the terms of the contract must be given an interpretation of ordinary significance." (punctuation omitted)); *Miller*, 323 Ga. App. at 118 (2) ("[I]f the terms of a contract are plain and unambiguous, the contractual terms

In this case, we agree with the trial court that the terms of the arbitration agreement are clear and unambiguous, and a plain reading of the contract fails to show that it was applicable to claims arising from the treatment of baby Isabelle. Indeed, a comparison of the agreements Jackie signed upon her admission to the hospital on July 11, 2019 (which were identical), shows the only difference between the two agreements is that one was signed at 7:24 a.m. and the other at 7:35 a.m. The fact that these arbitration agreements were signed minutes apart or that Jackie signed them while in pre-term labor in no way alters the *identical* language in both.[17] Instead,

_____

alone determine the parties' intent."); *S. Point Retail Partners*, 304 Ga. App. at 422 (1) ("If the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the trial court enforces the contract according to its literal meaning.").

[17] Emory cites to OCGA § 31-9-2 to support its assertion that Jackie signed one of the two agreements for purposes of obtaining treatment for her unborn baby. It fails to mention, however, that Jackie was not *required* to sign an agreement to obtain treatment for Isabelle because under OCGA § 31-9-2, parents may consent to treatment for their children in writing *or* orally. *See* OCGA § 31-9-2 (a) (3) ("In addition to such other persons as may be authorized and empowered, any one of the following persons is authorized and empowered to consent, either orally or otherwise, to any surgical or medical treatment or procedures not prohibited by law which may be suggested, recommended, prescribed, or directed by a duly licensed physician[ ] . . . [i]n the absence or unavailability of a living spouse, any parent, whether an adult or a minor, for his or her minor child[.]"). In any event, a plain reading of the agreements signed by Jackie makes clear that the arbitration clauses contained in those agreements do not apply to Isabelle.

9

looking only at the "plain and unambiguous" terms of the agreements Jackie signed,[18] the two agreements show no distinguishing factors to materially alter the terms upon which she agreed.[19]

The key here is that Jackie's signature on both agreements unambiguously identifies that they were signed in her *personal* capacity, *not* as a representative for her unborn baby.[20] Contracts, of course, "may be signed by one acting in a representative capacity,"[21] and "[t]raditional principles of agency law may bind a

---

[18] *See Miller*, 323 Ga. App. at 118 (2) ("[I]f the terms of a contract are plain and unambiguous, the contractual terms alone determine the parties' intent.").

[19] *See supra* note 10 & accompanying text.

[20] *See Keane v. Annice Heygood Trevitt Support Tr.*, 285 Ga. App. 155, 157 (645 SE2d 641) (2007) (rejecting argument that guarantor signed guaranty in representative capacity because while "the guaranty references the fact that [the signatory] is a shareholder, . . . it does not expressly provide that [the signatory] is signing the guaranty in this capacity" and the "language employed bound [the signatory] in his personal capacity").*Cf. Citrus Tower Blvd. Imaging Ctr., LLC v. Owens*, 325 Ga. App. 1, 5-6 (752 SE2d 74) (2013) ("[T]he guarantor under the Guaranty is specifically designated as the PC. Not once, but twice. Indeed, the name of the PC is clearly written on the signature line along with [the PC's principal's] signature, under which is [the PC's principal's] signature again, and which is then followed by an indication that he is signing in a representative rather than a personal capacity. The express and unambiguous language of the Guaranty establishes that the guarantor is the PC, not [the PC's principal]." (footnotes omitted)).

[21] *Elwell v. Keefe*, 312 Ga. App. 393, 395 (718 SE2d 587) (2011) (punctuation omitted); *accord Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 637 (786 SE2d 250) (2016).

nonsignatory to an arbitration agreement."[22] But importantly, nothing in either agreement indicates that Jackie was signing as her unborn child's representative. Indeed, Jackie did not complete the specific line to designate the "Relationship of Representative to Patient" on either agreement.[23] Moreover, nowhere on either agreement is Jackie's unborn child identified as the actual patient,[24] and the belated

---

[22] *Johnson*, 298 Ga. App. at 206 (2) (punctuation omitted).

[23] *See Bates v. Andaluz Waterbirth Ctr.*, 298 Or. App. 733, 739 (447 P3d 510) (2019) ("There is nothing in the text or context of the arbitration agreement, or in the remainder of the Midwife Disclosure, that evinces an intent of the parties that [the mother] would, by *signing in her individual capacity*, also be signing on behalf of her expected child." (emphasis supplied)). *Cf. Johnson*, 298 Ga. App. at 206 (2) (noting that admission contract with arbitration clause contemplated that the patient be bound by its provisions and that the patient's son was acting in a representative capacity when he checked one of eleven boxes by which to indicate capacity in which he represented the patient as a fiduciary); *Doyle v. Giuliucci*, 62 Cal. 2d 606, 607 (401 P2d 1) (1965) (upholding application of arbitration agreement to minor when "[p]laintiff's father entered into a contract for medical and surgical services with defendant . . . obligating [the medical] group 'to provide the same care and service to dependents of the Subscriber (plaintiff's father) as is available for the Subscriber'").

[24] The arbitration agreement was limited to a clause within the general admission paperwork, which included the note that "[i]f the individual signing this agreement is doing so on behalf of his or her minor child or any other person for whom he or she is legally responsible, the signature below affirms that he or she has the authority or obligation to contract with Emory for the provision of health care services to that minor child or other person, and that his or her execution of this agreement is in furtherance of that authority or obligation." But as previously discussed, Jackie signed under this note on *both* copies of the agreement, neither of which separately identified Isabelle as the patient she represented. Jackie also signed the copies while filling out the general admission

11

addition of a somewhat vague patient-identification sticker to the 7:24 a.m. agreement does not alter this fact.[25]

Emory laments that affirming the trial court's order will invalidate all admission forms signed by mothers on behalf of their unborn children, but this is fundamentally untrue. Had Jackie designated on the line beneath her signature in one of the agreements that she was signing it in a representative capacity (something an Emory employee could have easily double checked), the contracts would be separate and distinct.[26] For example, courts have compelled arbitration for a child when a

---

paperwork to obtain admission as a patient *herself*. Thus, Jackie's signature below this language on whichever form Emory now claims pertained to Isabelle simply cannot, *without more*, indicate she was signing in a representative capacity for another unnamed individual. If that were true, Jackie would have signed both agreements in a representative capacity and neither agreement in her personal capacity.

[25] It is undisputed the patient-identification sticker attached to the 7:24 a.m. agreement was added only *after* Jackie gave birth to Isabelle, which occurred *after* Jackie signed the agreement—making it "a unilateral modification of a contract previously entered into between the parties," which cannot inform the meaning of the contract Jackie assented to with her signature. *See Eden v. Eden*, 344 Ga. App. 864, 868 (1) (812 SE2d 317) (2018) ("It is elemental that it is not possible to have a unilateral modification of a contract previously entered into between the parties." (punctuation omitted)); *accord Am. Express Travel Related Servs. Co. v. Berlye*, 202 Ga. App. 358, 360 (2) (414 SE2d 499) (1991).

[26] The arbitration agreement in this case is distinguishable from that quoted in another recent decision. In *CL SNF, LLC v. Fountain*, 355 Ga. App. 176, 179 (1) (843 SE2d 605) (2020), *reversed on other grounds*, 312 Ga. 416 (863 SE2d 116) (2021), we

12

mother "signed two arbitration agreements, one in her name, and one in the name of" her yet unborn and unnamed "Baby or Babies."[27]

In sum, because the clear and unambiguous terms on the face of each agreement show that Jackie signed the contracts in her personal capacity, *not* in a

---

concluded—in non-binding *dicta*—that despite a representative's failure to indicate the capacity in which she was signing an agreement on behalf of an incoming resident to a skilled nursing facility, making her the party to the contract, the contract contemplated that her signature was in a representative capacity because the language of the arbitration agreement provided that "Resident" included "the Resident, his or her guardian, attorney-in-fact, agent, sponsor, representative, or any person whose claim is derived through or on behalf of Resident." *Id.* The agreement further provided that, if it was signed "by the Resident's representative[,] that individual represents that he or she is authorized and has no reason to believe that the Resident would not have signed this Agreement if he or she were competent and able to do so." *Id.* Additionally, this language was included in an arbitration agreement *separate* from the general admission agreement. *Id.* at 177. Jackie, on the other hand, consented to treatment identified as a patient in both agreements.

[27] *See McKinstry v. Valley Obstetrics-Gynecology Clinic, P.C.*, 428 Mich. 167, 174 (405 NW2d 88) (I) (1987) (holding that arbitration agreement bound minor when "[Mother] signed two arbitration agreements, one in her name, and one in the name of 'Baby or Babies McKinstry'"); *see also Johnson*, 98 Ga. App. at 206-07 (2) (noting that the admission contract with the arbitration clause contemplated that the patient be bound by its provisions and that the patient's son was acting in a representative capacity when he checked one of eleven boxes by which to indicate capacity in which he represented the patient as a fiduciary).

representative capacity on behalf of her unborn baby, we affirm the trial court's denial

of Emory's motion to dismiss and compel arbitration.[28]

*Judgment affirmed. Mercier and Pinson, JJ., concur.*

---

[28] To the extent Emory posits a new legal theory in its "intended beneficiary" assertions, we do not consider any such argument because it was not made before the trial court. *See, e.g.*, *City of Gainesville v. Dodd*, 275 Ga. 834, 837 (573 SE2d 369) (2002) ("[T]he appellate courts act in such cases as courts reviewing the decisions of the trial courts. In such a role, an appellate court is, among other things, a court for the correction of errors of law. An error of law has as its basis a specific ruling made by the trial court. There having been no rulings by the trial court on the issues raised on appeal, there are no rulings to review for legal error." (citations & punctuation omitted)). Additionally, we do not address any of Emory's arguments related to parol evidence because the terms of the agreements are clear and unambiguous. *See, e.g.*, OCGA § 13-2-2 (1) ("Parol evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained; so, if only a part of a contract is reduced to writing (such as a note given in pursuance of a contract) and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible[.]"); *Irvin v. Laxmi, Inc.*, 266 Ga. 204, 205 (1) (467 SE2d 510) (1996) ("Parol evidence may not be considered unless the written instrument is ambiguous.").

14